337 So.2d 1242 (1976)
Frank JACKSON
v.
STATE of Mississippi.
No. 49178.
Supreme Court of Mississippi.
October 5, 1976.
*1245 Lamar Conerly, Jr., C.A. Ray, Jr., Hazlehurst, for appellant.
A.F. Summer, Atty. Gen. by Vera Madel Speakes, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before GILLESPIE, SMITH and WALKER, JJ.
WALKER, Justice, for the Court:
Frank Jackson was tried, convicted and sentenced to death by the Circuit Court of Copiah County for the murder and attempted rape of Mrs. Georgia Mae Evans. In his appeal, Jackson has assigned several errors, involving the proof of corpus delicti, the lawfulness of his arrest, the admissibility of his confession, and the refusal of several requested instructions. We must also consider the constitutionality of Mississippi's capital punishment statutes in light of the cases recently decided by the Supreme Court of the United States.
On July 14, 1974, the body of Mrs. Georgia Mae Evans was found lying on the ground behind a junked automobile located to the rear of the victim's home. The body was clad in a nightgown and some pants which had been torn practically off the body. The private part of her body was exposed and a chewed match stem was lying on the private part. Bruises appeared on the head, arm, face and chin. There were flies on the body, and it appeared to have swollen.
On July 16, 1974, Jackson was arrested and charged with the murder of Mrs. Evans. On July 27, 1974, Jackson confessed to the crime. The confession was taped, reduced to writing, and signed by Jackson. Jackson's brother was one of the four witnesses to the confession. It reads as follows:
 July 27, 1974
 Sheriff's Office
 Hazlehurst, Miss.
My name is Frank Jackson and I was born on February 10, 1948.
My constitutional rights have been explained to me repeatedly by Sheriff Earl B. Guess. I understand that I have a right to remain silent and that anything I say can and will be used against me in Court. I know that I have a right to have a lawyer present to advise me and that a lawyer will be appointed for me free of charge if I cannot afford to pay one. I understand that if I decide to answer questions now without a lawyer present I can stop at any time I want to.
Sheriff Guess explained these rights to me when I was first taken into custody and he explained them to me each time that he questioned me, before any questions were asked. I almost completed the 12th grade and I fully understand these rights. Mr. Jim Kitchens, the district attorney, explained these same rights to me again today before he asked me any questions. I fully understand them and I am willing to give this statement without having a lawyer present. This was also true in regard to the prior statement I made to Sheriff Guess earlier today.
No one has threatened or abused me in any way, nor have any of the officers or *1246 the district attorney made me any promises.
On the night of July 13, 1974 Larry Perryman gave me a ride to Georgia Mae Evans' house on Thomas Road south of Crystal Springs, in Copiah County. Actually, Perryman took me to the house next door, which is the home of John Lewis Evans, Georgia Mae's brother-in-law, and I walked next door to Georgia Mae's house. Her brother, George Taylor, was in the house drunk and asleep.
I asked Georgia Mae Evans to have sexual relations with me and she refused. She said that she would not because I was living with her sister.
I pulled her out of the house, through the carport door, and forced her to go around the side of the house and back behind the house.
Georgia Mae was struggling the entire time, trying to get away from me.
I pulled her over behind an old car body  a blue and white Ford with no tires  where I hit her three or four times with my fist. I believe that each lick struck her in the face or head.
I am 6 feet 4 1/2 inches tall and I weigh about 200 pounds. At that time I worked every day as a logger.
As I was hitting her she finally fell to the ground and didn't move any more. I stayed there with her between five and eight minutes and saw no life signs except for her grunting a little.
My purpose in forcing Georgia Mae Evans from her house on that occasion was to force her to have sexual intercourse with me. She never at any time consented to have sexual intercourse with me and this is why I hit her. It was my intention and purpose to have sexual intercourse with her at that time, whether she consented or not.
When I realized that she was dead I ran away and walked home.
It was about 11:30 p.m. when I got to Georgia Mae's house that night and about 12:15 a.m. on July 14 when I got home.
I clearly remember everything that happened that night, even though I had been drinking whiskey and beer and smoking marihuana.
I have read the above statement, which consists of about four pages in Mr. Kitchens' handwriting, and it is true and correct. I have given this statement and am about to sign it of my own free will and accord.
Signed this the 27th day of July, 1974 at 1:10 o'clock p.m.
 /s/ Frank Jackson
 Witnesses: Jim Kitchens
 John O. Jackson
 Earl B. Guess
 Burnell Ramsey
On the night in question the murder victim's husband, Robert C. Evans, last saw his wife alive about 6 p.m. He did not stay at home the night of July 13, 1974, but went next door to his brother's house, where a party was in progress. The victim's husband came home about 2 a.m. on July 14 but did not look for his wife. Prior to this time, Jackson had told Robert C. Evans that he, Jackson, "was going to get even" with him because Robert had gone with one of Jackson's girl friends. Jackson and Robert C. Evans went to work together the next day. Evans did not know that his wife was dead. During the day, and before the body was found, Jackson said: "You all know what, brother [Robert Evans is called `Brother'] lost his wife ... he don't know where his wife is." Later, when Jackson and Robert got off work, Jackson said: "Bobbie Jean [a sister of the victim] ain't at home either and they probably gone to Jackson." After Robert came home some children found the body of Mrs. Evans lying on the ground behind her house beside a junked car.
John Lewis Evans, Robert's brother, saw the victim about 9:30 p.m. when she was at his home for a brief period during the party. Jackson was in and out of John Lewis Evans' house during July 13. On July 14, before the body was found, the defendant told John Lewis Evans that some "stuff was going on somewhere." Evans asked the defendant what he meant, and the defendant replied, "I don't know but there is *1247 some stuff going on somewhere." Further, while they were near the victim's house, Jackson was looking behind the house. After Robert C. Evans was taken to jail on July 14, the defendant said that Robert "didn't do it," and repeated time and again that he knew that Robert didn't do it and that he was going to get him out of jail. The defendant stated to John Lewis Evans that nobody could prove who committed the murder because "ain't nobody seen nothing and ain't nobody heard nothing."
Jerry Lewis Evans, the fifteen-year-old son of John Lewis Evans, testified that he was on his way home about 10:15 on the night of the murder, when the defendant asked him to go down to the victim's house with him to make a phone call. The same witness saw the murder victim standing in her door in a nightgown sometime after the defendant had gone there to make the call.

I.
The defendant assigns as error the action of the trial court in overruling defendant's motion to dismiss the indictment and suppress the confession.
The principal argument on behalf of the appellant is that there was no probable cause for his arrest, and that he was, therefore, illegally arrested. He argues that the confession should therefore be suppressed and the indictment dismissed. The conclusion reached by the appellant is not valid because an illegal arrest does not bar prosecution for the crime charged. An illegal arrest may result in the suppression of any evidence obtained thereby. However, a confession obtained after an illegal arrest is not necessarily excluded from evidence on the trial of the charge, absent a showing that the confession was in fact tainted by the illegal arrest. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); Harrison v. State, 307 So.2d 557 (Miss. 1975); Bell v. State, 274 So.2d 371 (Miss. 1973).
Appellant's entire argument and the conclusions he draws therefrom are predicated on the assumption that there was no probable cause for his arrest. Therefore, the precise inquiry here is whether there was probable cause for appellant's arrest. We reach the conclusion that there was probable cause and, therefore, we are not confronted with the problem of whether the confession was obtained by exploitation of his illegal arrest.
At the time Sheriff Guess arrested the defendant, the Sheriff had the following information: (1) He knew that a felony had been committed and the body had been found with obvious evidence of a criminal agency; (2) he knew that Frank Jackson almost always "chewed on a match"; (3) he had seen a chewed match on the private part of the victim's body; (4) he knew that Frank Jackson had a reputation for assault on women and that included rape; (5) he knew Mrs. Evans' body had been found clad only in a nightgown and panties which had been torn and left her private parts exposed; (6) he knew that Frank Jackson had been at Mrs. Evans' house on the night preceding her death and that no one had seen her alive since; (7) he had information from a reliable informant who had seen him enter Mrs. Evans' house; (8) he knew that Frank Jackson was a strong man and knew how to use a hold called the "sleeper"; (9) he knew that the hold cut off the supply of oxygen to the brain and Jackson had bragged about killing four women in Chicago with the "hold"; (10) he knew that Jackson had threatened to get even with the victim's husband for having taken one of his girl friends; and (11) he had talked to over 50 people in the community where Frank Jackson lived and all of them thought Frank Jackson was the killer.
It is unnecessary to detail the evidence establishing the information the sheriff had before he arrested the defendant. In our opinion, the facts in the aggregate establish probable cause overwhelmingly, and the sheriff would have been remiss in his duty had he not arrested the defendant.

II.
Jackson also argues that his confession should have been excluded as involuntary. *1248 However, since this case must be remanded for a new trial for reasons hereinafter discussed, and since in all probability the evidence will not be precisely the same upon retrial, and since the ultimate question will rest on the record then made, we are of the opinion that the evaluation of whether the alleged confession was given freely and voluntarily would serve no useful purpose. We would point out, however, that upon retrial, if the question of voluntariness of the alleged confession again comes before the court, the trial judge should dictate into the record his findings on each disputed fact which the defendant contends should bear on the voluntariness of the confession.

III.
It is contended that the corpus delicti was not sufficiently proven prior to the admission of the confession.
The corpus delicti in a homicide case consists of (1) the death of a human being, and (2) a criminal agency causing the death. The testimony showed that the body of the deceased was found at an unusual place under most unusual circumstances, bruised and swollen with indications of a rape attack. In our opinion, this was sufficient to establish criminal agency. This Court said in Buford v. State, 219 Miss. 683, 69 So.2d 826 (1954), as follows:
Where there has been a confession by the accused, much slighter evidence is required to establish the corpus delicti than would be necessary where the state must make out its entire case unaided by such confession. Garner v. State, 132 Miss. 815, 96 So. 743; Whittaker v. State, 169 Miss. 517, 142 So. 474; Anderson v. State, 184 Miss. 892, 186 So. 836. The corpus delicti need not be established beyond a reasonable doubt but to a probability, and proof coupled with a confession may be considered as establishing the corpus delicti beyond a reasonable doubt. Nichols v. State, 165 Miss. 114, 145 So. 903; Hayes [Hays] v. State, 214 Miss. 83, 58 So.2d 61. Where there has been a confession by the accused, any corroborative evidence will be held sufficient which satisfies the mind that there is a real and not an imaginary crime to which the accused had confessed. Garner v. State, supra. In a homicide case, the corpus delicti consists of the fact of death and the fact of the cause of death, and both such elements may be proved by circumstances. Watts v. State, 210 Miss. 236, 49 So.2d 240. Although the corpus delicti cannot be proved alone by the accused's confession, his criminal agency may be shown by his own confession. Roberts v. State, 153 Miss. 622, 121 So. 279. (Id. at 690, 69 So.2d at 830).

IV.
There is no merit in appellant's contention that the court erred in refusing defendant's requested instructions 2 and 10. Instruction no. 2 listed all the acts constituting capital murder and was properly refused because the State was not obligated to prove all of the alternatives listed therein. The State was only required to prove that the murder was committed in an attempt to rape the deceased. Instruction no. 10 was properly refused for the reason that there is not a scintilla of evidence to justify a verdict of manslaughter; it was either murder or nothing according to the evidence.

V.

CONSTITUTIONALITY OF MISSISSIPPI DEATH PENALTY STATUTES
The appellant contends that Mississippi's death penalty statute is unconstitutional and that he should be discharged; or, in the alternative, that his conviction should be reversed and the case remanded for a new trial; or, as a second alternative, that the sentence of death imposed upon him should be vacated and the case remanded for resentencing to life imprisonment.
At the time the briefs in this case were due, the United States Supreme Court had not decided the cases of Gregg v. Georgia, ___ U.S. ___, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); Jurek v. Texas, ___ U.S. ___, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Proffitt v. Florida, ___ U.S. ___, 96 S.Ct. 2960, *1249 49 L.Ed.2d 913 (1976); Woodson v. North Carolina, ___ U.S. ___, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); and Roberts v. Louisiana, ___ U.S. ___, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). However, appellant submits the constitutional issue on the briefs filed, at the request of this Court, in the case of Hill v. State (No. 48,985, argued July 6, 1976, and not yet decided).
At the outset, two principles now seem to be so firmly settled by Gregg and its companion cases that they require but scant reference by this Court:
(1) The death penalty is not per se unconstitutional. In Gregg, supra, after a lengthy discussion of the history of the death penalty, the Court held:

In sum, we cannot say that the judgment of the Georgia legislature that capital punishment may be necessary in some cases is clearly wrong. Considerations of federalism, as well as respect for the ability of a legislature to evaluate, in terms of its particular state the moral consensus concerning the death penalty and its social utility as a sanction, require us to conclude, in the absence of more convincing evidence, that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe.
Finally, we must consider whether the punishment of death is disproportionate in relation to the crime for which it is imposed. There is no question that death as a punishment is unique in its severity and irrevocability. Furman v. Georgia, supra, [408 U.S. 238] at 286-291, 92 S.Ct. [2726] at 2750-2753 [33 L.Ed.2d 346 (1972)] (Brennan, J., concurring), 306, 92 S.Ct. 2760 (Stewart, J., concurring). When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed. Powell v. State of Alabama, 287 U.S. 45, 71, 53 S.Ct. 55, 65, 77 L.Ed. 158 (1932); Reid v. Covert, 354 U.S. 1, 77, 77 S.Ct. 1222, 1262, 1 L.Ed.2d 1148 (1957) (Harlan, J., concurring in the result). But we are concerned here only with the imposition of capital punishment for the crime of murder, and when a life has been taken deliberately by the offender, we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes.

We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it. (Gregg, supra, ___ U.S. at ___, 96 S.Ct. at 2931-32, 49 L.Ed.2d at 882-83). (Emphasis added).
In its footnote 35, the Court added:
We do not address here the question whether the taking of the criminal's life is a proportionate sanction where no victim has been deprived of life  for example, when capital punishment is imposed for rape, kidnapping, or armed robbery that does not result in the death of any human being. (Id., ___ U.S. at ___, n. 35, 96 S.Ct. at 2932 n. 35, 49 L.Ed.2d at 882 n. 35).
(2) A mandatory sentence of death upon conviction of the commission of a particular offense is unconstitutional.
In Woodson, supra, the United States Supreme Court held:
It is now well established that the Eighth Amendment draws much of its meaning from "the evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. [86] 101 [78 S.Ct. 590, 2 L.Ed.2d 630 (1958)] (plurality opinion). As the above discussion makes clear, one of the most significant developments in our society's treatment of capital punishment has been the rejection of the common-law practice of inexorably imposing a death sentence upon every person convicted of a specified offense. North Carolina's mandatory death penalty statute for first-degree murder departs markedly from contemporary standards respecting the imposition of the punishment of death and thus cannot be applied consistently with the Eighth and Fourteenth Amendments' requirement *1250 that the State's power to punish "be exercised within the limits of civilized standards." Id., at 100 [78 S.Ct. at 598] (Id. ___ U.S. at ___, 96 S.Ct. at 2990, 49 L.Ed.2d at 959). (Emphasis added).
The holdings in these cases require us to take a second look at our death penalty statutes to determine the dominant intent of the legislature in enacting them; to determine whether the statutes are constitutional if implemented by procedural guidelines and safeguards approved in Gregg and its companion cases; and to determine whether this Court should exercise its inherent power to formulate guidelines which the Supreme Court of the United States has clearly held are required in death penalty cases.

A. What was the dominant intent of the Mississippi Legislature in enacting the present death penalty laws?
After the decision in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Mississippi, like many other jurisdictions, repealed its old "jury discretion" death penalty laws and attempted to enact new ones which would meet the requirements of Furman as that case had been widely interpreted, i.e., that the penalty of death, if applied at all, must be made mandatory upon the conviction of certain offenses.
The offenses for which the death penalty may now be inflicted are found in Mississippi Code Annotated sections 97-3-19(2), 97-3-65(1) and 97-25-55(1) (Supp. 1975), reproduced as Appendix A to this opinion. The present penalties for murder and capital murder are found in section 97-3-21:
Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the state penitentiary.
Every person who shall be convicted of capital murder shall be sentenced by the court to death.
In addition, section 99-17-20 contains, among other things, the following language:
The judge, in cases where the offense cited in the indictment is punishable by death, shall grant no instruction for the state or the defendant which instructs the jury as to their discretion to convict the accused of the commission of an offense not specifically set forth in the indictment returned against the accused.
Mississippi has always had a death penalty statute in some form or other. Article 12, Chapter 64, Title 2 of Hutchinson's Code of 1848 provided for a mandatory sentence of death. However, in 1875, the Mississippi Legislature abandoned mandatory capital sentencing and enacted a discretionary sentencing law. Laws of 1875, Chapter 58, Section 2. These former statutes can be found in Appendix B to this opinion.
It would appear from these enactments that Mississippi was in the vanguard of doing away with mandatory death penalties and found no dissatisfaction with its nonmandatory, jury discretion sentencing until the holding of the United States Supreme Court in Furman. Furman was widely construed to forbid the exercise of any discretion by the judge or jury in deciding whether a defendant convicted of certain offenses would suffer death. It is clear that the Mississippi Legislature so understood the holding in Furman, as did this Court by its holding in Stevenson v. State, 325 So.2d 113 (Miss. 1975):
[U]nder the decision in Furman, a mandatory death penalty statute is constitutional, when, as in this case, no showing was made that it was discriminatorily applied. Especially is this true in the light of Section 99-17-20, which prohibits the judge from instructing the jury on any lesser included offenses. Appellant in this case requested the instructions on lesser included offenses and the court properly refused to grant such instructions. Under this statute the jury has the option either to convict or to acquit the defendant and nothing more. (Id. at 116).
That opinion had the unanimous approval of the Justices of this Court. However, it is clear that we misinterpreted Furman, as *1251 did the legislatures and courts of other states.
A reading of sections 97-3-21 and 97-17-20 in the light of the history of death penalty statutes in Mississippi reveals beyond any question that the dominant intent of the legislature in 1974 was to enact a death penalty statute that would meet what were then considered to be constitutional requirements, and we so find.

B. Aware that mandatory sentences of death are unconstitutional, and having decided that the dominant intent of the legislature was to enact a constitutional death penalty law, may we now construe section 97-3-21 to be permissive and not mandatory?
We have concluded, after much study, that section 97-3-21 is not only susceptible to being construed as permissive, but that it is our duty to place such a construction upon it in order to uphold its constitutionality. In Teche Lines, Inc. v. Danforth, 195 Miss. 226, 12 So.2d 784 (1943), the Court expressed the rule as follows:
The rule is without exception that when the Court is confronted with a statute a literal construction of which would render it unconstitutional, the Court must adopt such a construction, when reasonably possible, as will save the statute, and at the same time save every savable provision or term in it. (195 Miss. at 254, 12 So.2d at 788).
See also Craig v. Mills, 203 Miss. 692, 705-07, 33 So.2d 801, 804-05 (1947); Kennington-Saenger Theatres, Inc. v. State, 196 Miss. 841, 870, 18 So.2d 483, 488 (1944); Grant v. Montgomery, 193 Miss. 175, 189, 5 So.2d 491, 492-93 (1941); Russell Investment Corp. v. Russell, 182 Miss. 385, 419, 182 So. 102, 107 (1938); Easterling Lumber Co. v. Pierce, 106 Miss. 672, 679-80, 64 So. 461 (1914); Marshall v. Grimes, 41 Miss. 27, 31 (1866).
Also in point is State v. County School Board, 181 Miss. 818, 181 So. 313 (1938), where this Court said that the word "may" may be construed as mandatory in application, while "shall" may be construed as permissive rather than mandatory, and quoted H. Black, Handbook on the Construction & Interpretation of Laws 529 (2d ed. 1911):
[W]ords in a statute importing permission or authorization may be read as mandatory, and words importing a command may be read as permissive or enabling, whenever, in either case, such a construction is rendered necessary by the evident intention of the legislature or the rights of the public or of private persons under the statute. (Id. 829, 181 So. at 315).
The Court went on to say, "When one construction of a statute would endanger its constitutionality, it will be construed in harmony with the Constitution if, under the language of the statute, this may reasonably be done." (Id. at 829, 181 So. at 315).
We therefore construe the second sentence of section 97-3-21 to mean that every person convicted of capital murder shall be sentenced by the court to death if that be the verdict of the jury after the defendant has been accorded a trial governed by procedures and guidelines designed to prevent the risk that the death penalty would be inflicted in an arbitrary and capricious or freakish manner. Such a construction is reasonable and proper and is necessary to carry out the dominant intent and purpose of the legislature.

C. What guidelines are mandated by Gregg and its companion cases in death penalty cases?
The recent cases explain that Furman intended, not to forbid jury discretion in death penalty cases, but to guard against arbitrariness and caprice. Gregg, supra, ___ U.S. at ___, 96 S.Ct. at 2932, 49 L.Ed.2d at 883. The Court in Furman sought not to abolish discretion, but to control it within constitutionally permissible guidelines.
The question to be determined is what safeguards and guidelines, in addition to those afforded defendants in other criminal cases, must be accorded an accused before the penalty of death may be imposed upon him.
*1252 We must look to the pronouncements in Gregg and its companion cases for the answer to that question.
It is readily apparent from the recent cases that the United States Supreme Court considers a bifurcated trial  guilt phase and sentencing phase  as desirable, if not in fact required, in order to overcome problems with respect to the introduction of evidence in a death penalty case, some of which would be relevant to the sentencing decision but would have no relevance to, or may even be prejudicial to the question of guilt. In this regard, the Court said:
While Furman did not hold that the infliction of the death penalty per se violates the Constitution's ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty, Furman held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. ...

Furman mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner. We have long recognized that "[f]or the determination of sentences, justice generally requires ... that there be taken into account the circumstances of the offense together with the character and propensities of the offender." Pennsylvania v. Ashe, 302 U.S. 51, 55 [58 S.Ct. 59, 82 L.Ed. 43] (1937). See also Williams v. Oklahoma, 358 U.S. 576, 585 [79 S.Ct. 421, 3 L.Ed.2d 516] (1959); Williams v. New York, 337 U.S. 241, 247 [69 S.Ct. 1079, 93 L.Ed. 1337] (1949). Otherwise, "the system cannot function in a consistent and rational manner." ...
If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.

Jury sentencing has been considered desirable in capital cases in order "to maintain a link between contemporary community values and the penal system  a link without which the determination of punishment could hardly reflect `the evolving standards of decency that mark the progress of a maturing society.'" But it creates special problems. Much of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question. This problem, however, is scarcely insurmountable. Those who have studied the question suggest that a bifurcated procedure  one in which the question of sentence is not considered until the determination of guilt has been made  is the best answer. ...
When a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifurcated system is more likely to ensure elimination of the constitutional deficiencies identified in Furman.

(Gregg, supra, at ___ U.S. ___, 96 S.Ct. at 2932-34, 49 L.Ed.2d at 883-85). (Emphasis added).
Later in the opinion, the Court said:
As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the *1253 information relevant to the imposition of sentence and provided with standards to guide its use of the information. (Id., ___ U.S. at ___, 96 S.Ct. at 2935, 49 L.Ed.2d at 887).
In the exercise of this Court's inherent power to prescribe rules of procedure recognized in Newell v. State, 308 So.2d 71 (Miss. 1975), we now hold that cases involving the death penalty shall be conducted at a bifurcated trial  a guilt-finding phase and a sentence-determining phase.
We now proceed to a discussion of aggravating and mitigating circumstances which may be considered on the question of sentence. It is clear from the recent cases that guidelines in a death penalty case must be designed to focus on the relevant facets of the character and record of the individual offender and circumstances of the particular offense and to permit the introduction of compassionate or mitigating factors.
In Woodson v. North Carolina, the Court said:
A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind. It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death. (Woodson, supra, ___ U.S. at ___, 96 S.Ct. at 2991, 49 L.Ed.2d at 961).
In Jurek v. Texas, that Court said:
[A] sentencing system that allowed the jury to consider only aggravating circumstances would almost certainly fall short of providing the individualized sentencing determination that we today have held in Woodson v. North Carolina, post, ___ U.S. ___, pp. ___-___, 96 S.Ct. [2978], pp. 2991-2992, [49] L.Ed.2d [944, 960-62], to be required by the Eighth and Fourteenth Amendments. For such a system would approach the mandatory laws that we today hold unconstitutional in Woodson and Roberts v. Louisiana, post. A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.

Thus, in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances. (Jurek, supra, ___ U.S. at ___, 96 S.Ct. at 2956, 49 L.Ed.2d at 938). (Emphasis added).
It is suggested in Gregg and Proffitt that the main circumstances of aggravation and of mitigation should be weighed and weighed against each other by the sentencing authority before returning its verdicts. Gregg, supra, ___ U.S. at ___, 96 S.Ct. at 2934-35, 49 L.Ed.2d at 886; Proffitt, supra ___ U.S. ___, 96 S.Ct. at 2966-67, 49 L.Ed.2d at 922-23. The Court pointed out that providing relevant information under fair procedural rules is not alone sufficient to guarantee that the information will be properly used in the imposition of punishment, especially if sentencing is performed by a jury. The Court noted:
While some have suggested that standards to guide a capital jury's sentencing deliberations are impossible to formulate, the fact is that such standards have been developed. When the drafters of the Model Penal Code faced this problem, they concluded "that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed and weighed against each other, when they are presented in a concrete case." Model Penal Code § 201.6, Comment 3, p. 71 (Tent. Draft No. 9, 1959)... . While such standards are by necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary. (Gregg, supra, ___ U.S. at ___, 96 S.Ct. at 2934-35, 49 L.Ed.2d at 886).
*1254 The aggravating circumstances discussed in the case are, for the most part, the elements of the offenses as defined by the statutes, such as whether the crime was committed in the course of a particular felony, or whether it was committed for hire. This was noted in Jurek v. Texas, where the Court said:

While Texas has not adopted a list of statutory aggravating circumstances, the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose. .. . In fact, each of the five classes of murders made capital by the Texas statute is encompassed in Georgia and Florida by one or more of their aggravating circumstances... . Thus, in essence, the Texas statute requires that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed. So far as consideration of aggravating circumstances is concerned, therefore, the principal difference between Texas and the other two States is that the death penalty is an available sentencing option  even potentially  for a smaller class of murders in Texas. Otherwise the statutes are similar. Each requires the sentencing authority to focus on the particularized nature of the crime. (Jurek, supra, ___ U.S. ___, 96 S.Ct. at 2955-56, 49 L.Ed.2d at 937-38). (Emphasis added).
Although Mississippi has not adopted a list of statutory aggravating circumstances, the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of instances for which a death sentence may ever be imposed serves the same purpose just as it did in Texas. In essence, the Mississippi statutes require that the jury find the existence of a statutory aggravating circumstance before the death penalty may be imposed. In the case sub judice that would be the fact that the murder was committed during the course of an attempted rape. Miss. Code Ann. § 97-3-19(2)(e) (Supp. 1975).
Like Mississippi, the Texas statutes did not provide for proof of mitigating circumstances; however, the opinion in Jurek points out that the Texas Court of Criminal Appeals had held in effect that "in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it." (Id., ___ U.S. at ___, 96 S.Ct. at 2957, 49 L.Ed.2d at 939). The Court concludes, "It thus appears that, as in Georgia and Florida, the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death." (Id., ___ U.S. at ___, 96 S.Ct. at 2957, 49 L.Ed.2d at 939).
It is thus evident that Texas implemented its death penalty statute, by judicial construction, to permit the introduction of relevant mitigating circumstances by an accused to show why the death penalty should not be imposed. This is in effect what we are today deciding to do.
We now hold that at the sentencing hearing, the defendant may introduce competent evidence relevant to the determination of his punishment, even though such evidence might not have been admissible on the question of his guilt. He may prove his lack of a prior criminal record and may introduce such other evidence of his character or the particular circumstances of his crime that would be relevant in deciding whether he should be sentenced to death or life imprisonment.

D. May the jury, in a death penalty case, be instructed as to the possibility of their finding the accused guilty of a lesser included offense?
Directly related to the constitutional issues involved in this case, is the question of whether the court can instruct the jury as to their right to convict an accused of a lesser included offense of a capital crime when such a conviction is warranted by the *1255 evidence. Such an instruction, when warranted by the evidence, is desirable in order to facilitate the orderly and efficient administration of justice so that as many issues as practical can be disposed of during the trial of a given case. Prohibiting the court to instruct as to the lesser included offenses could result in needless retrials should the jury be unable to agree on its verdict with regard to the capital offense charged. The already overburdened judicial system cannot afford such a waste of time and energies. Such a procedure not only constitutes an impediment to full, complete and efficient administration of justice, but creates additional financial and emotional hardships upon the accused person and his family by delaying a final determination of his case.
The granting of such instructions has the tacit approval of the United States Supreme Court. The practice was mentioned in both Gregg and Proffitt. In Proffitt, the Court noted:
The petitioner also argues that since the Florida Court does not review sentences of life imprisonment imposed in capital cases or sentences imposed in cases where a capital crime was charged but where the jury convicted of a lesser offense, it will have an unbalanced view of the way that the typical jury treats a murder case and it will affirm death sentences under circumstances where the vast majority of judges would have imposed a sentence of life imprisonment. As we noted in Gregg v. Georgia, ante, p. ___, 96 S.Ct. p. 2940 n. 56, [49 L.Ed.2d at 892 n. 56,] this problem is not sufficient to raise a serious risk that the state capital-sentencing system will result in arbitrary and capricious imposition of the death penalty. (Id., ___ U.S. at ___, 96 S.Ct. at 2970 n. 16, 49 L.Ed.2d at 927 n. 16). (Emphasis added).
In Newell, supra, 308 So.2d at 76, this Court said:
We are keenly aware of, and measure with great respect, legislative suggestions concerning procedural rules and they will be followed unless determined to be an impediment to justice or an impingement upon the constitution.
We have concluded that the provision of section 99-17-20 prohibiting the granting of jury instructions as to lesser included offenses, constitutes an impediment to full and complete administration of justice in the trial of capital cases and is therefore not binding on the courts in the trial of these cases.
We therefore hold that, when warranted by the evidence, the trial court may instruct the jury with reference to lesser included offenses. However, such an instruction should not be indiscriminately or automatically given, as was condemned in Roberts, supra, ___ U.S. at ___, 96 S.Ct. at 3007, 49 L.Ed.2d at 982, but should only be given after the trial court has carefully considered the evidence and is of the opinion that such an instruction is justified by the evidence.

E. Appellate review.
The cases of Gregg, Proffitt, Jurek, Woodson and Roberts clearly require meaningful appellate review designed to determine whether the imposition of the death penalty is warranted in any given cases. Compare Gregg, supra, ___ U.S. at ___, 96 S.Ct. at 2939-40, 49 L.Ed.2d at 892-93, with Roberts, supra, ___ U.S. at ___, 96 S.Ct. at 3007, 49 L.Ed.2d at 982. The appellate court must insure that the aggravating and mitigating circumstances present in one case will lead to a result similar to that reached under similar circumstances in another case, thus preventing the wanton and freakish imposition of death penalties. Proffitt, supra, ___ U.S. at ___, 96 S.Ct. at 2969-70, 49 L.Ed.2d at 926-27.
We therefore hold that cases in which a sentence of death is imposed will be automatically reviewed as preference cases in this Court. The record will be reviewed and compared with similar cases to determine whether the punishment of death is too great when the aggravating and mitigating circumstances are weighed against each other, and to assure that the death *1256 penalty will not be wantonly or freakishly imposed but will only be inflicted in a consistent and evenhanded manner under like or similar circumstances.

CONCLUSION
We now hold that a trial in which the defendant is subject to receiving the penalty of death must be conducted in two phases:
The first phase shall deal only with the question of guilt or innocence of the accused of either the capital crime with which he is charged or, if warranted by the evidence, a lesser included offense. The first phase of the trial relating to guilt or innocence shall be conducted in all respects in the same manner that other criminal trials are now conducted.
If the jury at the first phase of the trial finds the defendant guilty of the capital offense with which he is charged, the trial court shall immediately, if practical, conduct a separate sentencing hearing before the same jury. However, if this should be impossible for some reason now unforeseeable, the sentencing hearing may be conducted before another jury.
At the sentencing hearing, the question to be decided by the jury is whether the defendant shall be sentenced to death or to life imprisonment. At this hearing, the State may elect to stand on the case made at the first hearing, if before the same jury, or may reintroduce any part of the evidence adduced at the first hearing which it considers to be relevant to the particular question of whether the defendant shall suffer death or be sentenced to life imprisonment. In addition thereto, an accused's prior record of criminal convictions, if any, may be proven as an additional aggravating circumstance whether the defendant testifies in his own behalf or not. At this hearing, the defendant may prove his lack of a prior criminal record as a mitigating circumstance and may also adduce proof of any other circumstance or combination of circumstances surrounding his life and character or the commission of the offense with which he is charged that would be reasonably relevant to the question of whether he should suffer death or be sentenced to life in prison.
Proof beyond a reasonable doubt of the statutory elements of the capital offense with which the accused is charged shall constitute sufficient circumstance to authorize imposition of the penalty of death unless the mitigating circumstances shown by the evidence outweigh the aggravating circumstances.
The jury shall not be required to make a special finding of any mitigating circumstance in order to return a verdict that the accused should be sentenced to life in prison. However, before the jury may return a verdict that the defendant should suffer the penalty of death, they must unanimously find in writing that after weighing the mitigating circumstances and the aggravating circumstances one against the other that the mitigating circumstances do not outweigh the aggravating circumstances and that the defendant should suffer the penalty of death.
If the jury is unable to agree unanimously on a verdict at the sentencing hearing, the defendant shall be sentenced to life in prison.
We also hold that all convictions of persons where the penalty of death is imposed will be reviewed by this Court as preference cases in such a manner as to see that the death penalty was warranted under the facts of the case and that death sentences will not be wantonly or freakishly imposed but will only be inflicted in a consistent and evenhanded manner under like or similar circumstances.
We hold that Mississippi's death penalty statute is constitutional as construed and implemented by this opinion and that it satisfies the concerns expressed in Furman and the other recent cases. The defendant's contention, among other things, that he should be discharged, or in the alternative, resentenced to life imprisonment is not well taken. He must be retried in accordance with the procedures outlined *1257 above and the ultimate question of whether he will suffer the penalty of death or be sentenced to life imprisonment, if again found guilty, will rest with the jury at the sentencing hearing.
We have discussed the practicality of remanding this case to the trial court for the purpose of determining sentence only, but we are of the opinion that justice demands that the persons convicted and sentenced to death prior to our holding today should have the benefit of all the guidelines outlined herein.
The judgment of the lower court is reversed and this cause is remanded to the Circuit Court of Copiah County for a new trial consistent with this opinion.
REVERSED AND REMANDED FOR A NEW TRIAL.
GILLESPIE, C.J., and SMITH, ROBERTSON and SUGG, JJ., concur.
SUGG, J., specially concurring.
INZER and PATTERSON, P. JJ., and BROOM and LEE, JJ., dissent.

APPENDIX A

Section 97-3-19(2)
The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
(a) Murder which is perpetrated by killing a peace officer or fireman while such officer or fireman is acting in his official capacity or by reason of an act performed in his official capacity, and with knowledge that the victim was a peace officer or fireman. For purposes of this paragraph, the term "peace officer" means sheriff of counties and their deputies, constables, marshals and policemen of cities and towns, game wardens, parole officers, a judge, prosecuting attorney or any other court official, agents of the alcoholic beverage control division of the state tax commission, agents of the bureau of narcotics, personnel of the Mississippi Highway Patrol, and the superintendent and his deputies, guards, officers and other employees of the Mississippi State Penitentiary;
(b) Murder which is perpetrated by a person who is under sentence of life imprisonment;
(c) Murder which is perpetrated by use or detonation of a bomb or explosive device;
(d) Murder which is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals;
(e) When done with or without any design to effect death, by any person engaged in the commission of the crime of rape, burglary, kidnapping, arson or robbery, or in any attempt to commit such felonies;
(f) Murder which is perpetrated by the killing of any elected official of a county, municipal, state or federal government with knowledge that the victim was such public official.

Section 97-3-65(1)
Every person eighteen (18) years of age or older who shall be convicted of rape by carnally and unlawfully knowing a female child under the age of twelve (12) years, upon conviction, shall be sentenced to death; provided, however, any person thirteen (13) years of age or over but under eighteen (18) years of age convicted of such crime shall be sentenced to such term of imprisonment as the court, in its discretion, may determine. In all cases where the female child is under the age of twelve (12) years it shall not be necessary to prove penetration of the female's private parts where it is shown the private parts of the female have been lacerated or torn in the attempt to have carnal knowledge of her.

Section 97-25-55(1)
The offense of aircraft piracy is defined as the seizure or exercise of control, by force or violence or threat of force or violence, of any aircraft within the airspace jurisdiction of the State of Mississippi. Any person convicted of the offense of aircraft piracy shall suffer death.

*1258 APPENDIX B
Art. 12, Ch. 64, Title 2, Hutchinson's Code of 1848.
§ 1. Crimes Punishable with Death. Every person who shall hereafter be convicted 
Of Treason against this state: or
Of Murder: or,
Of Arson in the first degree:
As those crimes are respectively declared in this title, shall suffer death for the same.
2. The following acts shall constitute treason against this state:
Levying war against this state, within the state: or,
Treason, what Acts to Constitute. A combination of two or more persons, by force, to usurp the government of this state, or to overturn the same, evidenced by a forcible attempt, made within this state, to accomplish such purpose: or,
Adhering to the enemies of this state, while separately engaged in a war with a foreign enemy, in the cases prescribed in the constitution of the United States, and giving to such enemies aid and comfort, in this state or elsewhere.
3. Killing of a Human Being, &c. The killing of a human being, without the authority of law, by poisoning, shooting, stabbing, or any other means, or in any other manner, is either murder, manslaughter, or excusable or justifiable homicide, according to the facts and circumstances of each case.
4. In what Cases to be Murder. Such killing, unless it be manslaughter or excusable or justifiable homicide, as hereinafter provided, shall be murder in the following cases:
When perpetrated from a premeditated design to effect the death of the person killed, or of any human being:
When perpetrated by an act eminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual:
When perpetrated without any design to effect death, by a person engaged in the commission of a felony.
5. Killing in a Duel, to be Murder, Principal and Second equally Liable. Every inhabitant or resident of this state, who shall, by previous appointment or engagement, fight a duel, without the jurisdiction of this state, and, in so doing, shall inflict a wound upon his antagonist or any other person, whereof the person thus injured shall die within this state, and every second engaged in such duel, shall be deemed guilty of murder within this state, and may be indicted, tried, and convicted, in the county where such death shall happen.

.....
24. Punishment of Death, Manner of Infliction. The punishment of death shall, in all cases, be inflicted by hanging the convict by the neck until he be dead.
Laws of 1875, Chapter 58, Section 2
Be if further enacted, That in all cases where any person, or persons, upon conviction of crime, shall, or may be punished with death, the jury may, in their discretion, in their verdict, declare that the penalty, or punishment, shall be imprisonment in the Penitentiary for life; but if the jury shall omit to so declare the penalty in their verdict, then the Court shall pronounce the death penalty.
SUGG, Justice (specially concurring):
I concur in the reversal of the case upon the asserted grounds but not upon its remand for a trial on the issue of guilt.
The only deficiencies in our capital murder statute are that the jury is not permitted to consider whether mitigating circumstances outweigh aggravating circumstances and the prohibition against instructing that a defendant may be convicted of a lesser included offense. We do not have the question of a lesser included offense in this case.
The United States Supreme Court in the recent death penalty cases suggested a bifurcated hearing at which the defendant *1259 may introduce evidence of mitigating circumstances. As stated in Jurek v. Texas, ___ U.S. ___, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), "A jury must be allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed."
Under our capital murder statute aggravating circumstances are contained in the statutory definition of capital murder and must be proved before a jury may convict of capital murder. This case falls under Mississippi Code Annotated section 97-3-19(2)(e) (Supp. 1975) where murder perpetrated by a person engaged in the commission of the crime of attempted rape is defined as capital murder.
Thus, when the jury returned a verdict of guilty of capital murder it necessarily found that the murder was committed while the defendant was engaged in the commission of the crime of attempted rape. It was implicit in the verdict of the jury that the aggravating circumstances prescribed by statute were present in this case, namely, that defendant committed murder while in commission of the crime of attempted rape. I see no necessity of having a second jury ratify this conviction. Another jury should be empaneled only to consider the sentence to be imposed under the procedure set forth in the majority opinion.
This procedural safeguard affords the defendant an opportunity to convince a jury that he should not suffer the death penalty. A separate sentence hearing would permit him to introduce any significant or relevant facets of his character and record, or the circumstances of the particular case, thereby permitting the jury to consider mitigating circumstances.
Remanding the case to be heard by a jury on the question of sentence only would meet the requirements of Woodson v. North Carolina, ___ U.S. ___, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), where the Supreme Court denounced treating all persons convicted of a designated offense in the same manner as members of a "faceless undifferentiated mass to be subjected to the blind infliction of the penalty of death."
The procedure which I favor would not amount to this Court defining or prescribing the penalty for capital murder because the capital murder statute is a product of legislative action. The statute was passed before this crime was committed and the Legislature clearly expressed its intention that death should be the punishment for certain crimes, including the one with which defendant was charged.
In remanding the case for a hearing on the question of sentence only, we would not violate the Federal and State constitutional prohibitions against ex post facto laws. We would not make an act a violation of the law after the act occurred because the crime of capital murder was defined by the Legislature before the acts constituting the crime occurred. Neither would we prescribe punishment by judicial legislation, but would provide the means to carry out the intent of this Legislature by removing the constitutional infirmity of mandatory death sentences.
By remanding the case for resentencing only for a hearing by a jury empaneled for the purpose of fixing punishment, we would afford both the defendant and the State the opportunity to home in on the question of whether defendant is an individual who should suffer the death penalty for the crime which he committed.
There is no valid reason to require another jury to ratify the finding of guilt by the first jury.[1]
*1260 INZER, Presiding Justice (dissenting):
All Justices of this Court are in agreement that the decisions of the Supreme Court of the United States in Woodson v. North Carolina, ___ U.S. ___, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and Roberts v. Louisiana, ___ U.S. ___, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), leave no doubt that the Supreme Court of the United States would hold our capital murder statutes as written in violation of the Eighth and Fourteenth Amendments to the Constitution of the United States. We are also all in agreement that in deciding a question involving the Constitution of the United States, we are compelled to follow the decisions of the Supreme Court of the United States. That being the case, we are compelled to hold in this appeal that the imposition of the death penalty constitutes cruel and unusual punishment and must be set aside. In my opinion it naturally follows that before the death penalty can be legally imposed the legislature must amend the statute to meet the requirements laid down by the Supreme Court of the United States. While I agree that this Court has the inherent power to prescribe rules of procedure, I cannot agree and I dissent from that part of the majority opinion which holds that we can invade the legislative field and amend a statute under the guise of construing it, or prescribing Court procedure. This Court has heretofore been careful to adhere to the Constitutional provision relative to the separation of powers. We have always recognized that the authority to say what constitutes a crime and prescribe the punishment therefor is a legislative function. Justice Griffith, writing for this Court in Gabriel v. Brame, Sheriff, 200 Miss. 767, 28 So.2d 581 (1947), stated this truism as follows:
Two propositions are fundamental, as we think, the first of which is that punishment for crime has its basis solely in its effect as a deterrent as against future offenses  that punishment for the sake of punishment, or for vengeance alone, has no place in the processes of human tribunals. And as a deterrent, a present offender is as much within the object as others in general. And, secondly, that the authority to say what constitutes a crime, and what punishment shall be inflicted is in its entirety a legislative question, save as to punishment which is cruel and inhuman, and being so, the law-making authority may prescribe not only the penalty but also such incidents and conditions as will in the judgment of the legislature best serve the general policy which is the basis of all criminal sentences. (Emphasis added) (200 Miss. at 773, 28 So.2d at 582).
It is clear from the foregoing statement that this Court has the authority and duty to say that the punishment prescribed by the legislature under our capital murder statute constitutes cruel and inhuman punishment, but we do not have the authority to prescribe incidents and conditions necessary to make the statute constitutional. That function belongs entirely to the legislature.
I think we all agree that it is the function of the legislature to prescribe the aggravating circumstances which must be met before the death penalty may be imposed and that the statute as passed sufficiently meets this requirement. I am unable to see why it is not likewise a legislative function for it to prescribe the mitigating circumstances. The case of Jurek v. Texas, ___ U.S. ___, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), is not authority for the proposition that this Court has the power to prescribe the circumstances under which the death penalty may be imposed.
In the first place the Texas statute does not provide for a mandatory death penalty, but provides that the defendant could be convicted of a lesser included offense. The statute goes further and provides that after conviction before the death penalty may be imposed, the same jury must answer the following questions:
(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
(2) whether there is a probability that the defendant would commit criminal *1261 acts of violence that would constitute a continuing threat to society; and
(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased. (Texas Code Crim.Proc., Art. 37.071(b) (Supp. 1975-1976)). (___ U.S. at ___, 96 S.Ct. at 2955, 49 L.Ed.2d at 937).
All that the Texas Court of Criminal Appeals did was to hold that under the second question a defendant could bring to the jury's attention whatever mitigating circumstances he might be able to show. This is a far cry from what the majority is doing in this case.
I am unable to agree that this Court can construe the word "shall" to mean "may" in regard to the imposition of the death penalty as provided in the capital murder statute. It is apparent that the legislature intended to provide, and did provide, that the only sentence that could be imposed upon conviction of capital murder is death. This is made amply clear by the fact that it repealed Section 99-19-13, Mississippi Code 1972 Annotated, which provided as follows:

In any case in which the penalty prescribed by law upon the conviction of the accused is death, except in cases otherwise provided, the jury finding a verdict of guilty may fix the punishment at imprisonment for the natural life of the party; and thereupon the court shall sentence him accordingly; but if the jury shall not thus prescribe the punishment, the court shall sentence the party found guilty to suffer death, unless the jury by its verdict certify that it was unable to agree upon the punishment, in which case the court shall sentence the accused to imprisonment in the penitentiary for life. (Emphasis added).
With the repeal of this section, neither the jury nor the court has any authority to impose any other sentence except death in a capital murder case. The legislature then went further and provided that the court could not instruct as to a lesser included offense. When one reads the capital murder statute in its entirety, it is clear that it is unreasonable to say that the word "shall" means "may."
The majority also invades the province of the legislature by striking down that part of the statute which prohibits the granting of the jury instruction as to lesser included offenses. Even this does not solve the problem because with the repeal of Section 99-19-13, supra, there is no authority for the jury to impose any sentence other than death in a capital murder case.
The majority then proceeds to legislate further by providing for a sentencing hearing before the same jury or another jury where mitigating circumstances may be proved and considered by the jury. While this procedure is desirable and necessary to meet the constitutional requirements it is not a judicial function, but a legislative one.
Finally, the effect of the majority opinion is to place this Court in the position of prescribing the mitigating circumstances to be considered by the jury. Further, this Court would be required to review the fact finding of the jury on this question, thus, placing this Court in the position of making the ultimate decision of whether the death penalty may be imposed in any given case.
While the majority may see the necessity of the Court departing from its traditional role and invading the legislative field, I am unable to see such necessity. Furthermore, even if this Court has the power to do what it is doing by its decision in this case, this is not such a case that it should exercise this power. When this Court is dealing with the question of whether a person shall live or die, no doubtful or questionable procedures should be followed. It is clear that if we leave to the legislature its traditional role, we would simply hold that the death penalty provided for in the statute cannot be legally imposed, and do as the Supreme Court of South Carolina did in State v. Rumsey, 226 S.E.2d 894 (S.C. 1976) and uphold appellant's conviction of murder and remand the case for the imposition of a life sentence. This is the procedure we followed after Furman. See Capler v. State, 268 So.2d 338 (Miss. 1972). This seems to me to be the safe, sensible and practical *1262 procedure to follow and to do so would do away with the necessity of a new trial, thus, relieving the already overburdened judicial system of the waste of its time and energy. It would also relieve the financial and emotional hardships of the defendant and his family by making a final determination of this case. I am confident that the legislature, if it so desires, is capable of performing its plenary power of passing legislation that will comply with the decisions of the Supreme Court of the United States without the intervention of this Court.
PATTERSON, P.J., and BROOM and LEE, JJ., join in this dissent.
NOTES
[1] It is deeply embedded in our jurisprudence that a jury verdict may be affirmed as to guilt, but the case remanded for resentencing when the sentence is greater than permitted by law or when the proof is insufficient to sustain a conviction for the crime charged, but sufficient to sustain a conviction for a lesser included offense. Wells v. State, 305 So.2d 333 (Miss. 1974); Anderson v. State, 290 So.2d 628 (Miss. 1974); Corley v. State, 264 So.2d 384 (Miss. 1972); Woodall v. State, 234 Miss. 759, 107 So.2d 598 (1958); Washington v. State, 222 Miss. 782, 77 So.2d 260 (1955); Webb v. State, 30 So.2d 894 (Miss. 1947); Daniels v. State, 196 Miss. 328, 17 So.2d 793 (1944).