BUFORD *v.* STATE.

Jan. 25, 1954

No. 38973          50 Adv. S. 21          69 So. 2d 826

*P. A. Martin, Jr.,* Fulton, for appellant.

*Joe T. Patterson,* Asst. Atty. Gen., Jackson, for appellee.

HOLMES, J.

The appellant was tried in the Circuit Court of Itawamba County of an indictment charging him with the murder of Henderson Nelson. The jury found him guilty as charged but disagreed as to his punishment, and he was accordingly sentenced to imprisonment in the state penitentiary for life. He prosecutes this appeal from the judgment of conviction.

The sole contention on this appeal is that the proof aliunde the confession of the accused is insufficient to establish the corpus delicti, and that, therefore, the evidence is insufficient to support the conviction, and that appellant's motion for a new trial based upon this ground should have been sustained. The solution of the question presented necessitates a brief review of the evidence.

The case is unusual in that while the appellant confessed that he shot the deceased with a .22 pistol, an autopsy performed on the body of the deceased and a subsequent X-ray examination of the body revealed neither a point of exit of the bullet nor the presence of the bullet in the body, and a reputable surgeon testified that in his opinion the deceased was struck by some sharp object and not a gun and that something else besides a bullet caused his death.

The state's proof showed substantially the following: The deceased was a Spanish-American war veteran. He was over 70 years of age and lived alone in his own home located in a rural section of Itawamba County just off of Highway 25. He appears to have had few associates and lived more or less the life of a recluse. He did his own cooking in his yard, where, at a distance of ten or fifteen steps from his house, he had erected a frame consisting of one upright post and two supporting pieces, which he apparently used for the suspension of his cooking utensils. His near neighbors were Mr. and Mrs. J. C. Bennett, who lived about 200 yards from him. Mr. Bennett operated a store in the vicinity. The deceased was last seen alive on the afternoon of Friday, May 2, 1952, when Mrs. Bennett observed him going to her husband's store, and again saw him as he was returning from the store with what appeared to be a sack of groceries in his hand. He stopped at his mail box and then disappeared from Mrs. Bennett's view as he went toward his home. Shortly thereafter, she heard a shot fire in the direction of the deceased's home. She feared that Mr. Nelson might have shot her dog, but on

calling her dog, he came and she went back to her house. Mr. Bennett saw the deceased when he reached the store and sold him a can of tomatoes and a can of peaches which were placed in a sack and which the deceased carried away in his hand when he left the store. The deceased paid cash for these articles. He carried his wallet in his shirt pocket which had a flap on it and which he customarily kept pinned with a safety pin, and on this occasion he temporarily unpinned the flap for the purpose of removing his money.

In the early afternoon of Saturday, May 3, 1952, Ted Reese, a resident of the vicinity, found the dead body of the deceased. He was lying on his back in a pool of blood with his hat on, near the center post of the frame which he had erected in his yard. His right arm was around the post as though he had tried to support himself as he fell. Near his right hand was a raw Irish potato. He had a wound in his left side about four inches below the arm pit. The flap on his shirt pocket was unpinned and his wallet was gone. A safety pin was found on the ground between his body and his left arm. He had bled profusely from his mouth. He was stiff and the blood had caked on his face. On the arrival of the officers and upon an inspection of the premises, they found on the deceased's porch the sack containing the can of peaches and the can of tomatoes. They searched the deceased and removed from his person a dime, a watch, a piece of rope, and a lug off an automobile tire. Upon examining the interior of the house, they found pried open the glass door of a desk or bookcase. They found that the back of the house was high enough from the ground for a man to stand erect under, and that the signs on the ground indicated that someone had been standing or sitting on the ground. There were on the ground a cigarette butt, burned matches, and torn paper from a can of Prince Albert tobacco, indicating that someone had been smoking under the house. The state's witness, Tom Williams, testified that

on the morning of May 2, 1952, he was plowing in his field near the road and saw a man walking along the road toward Smithville; that the man waved at him; that after the arrest of the appellant, the witness requested the sheriff to take him to see the appellant in jail to see if he could identify him as the man he had seen walking along the road; that he went to the jail with the officer, and on arriving there, asked the appellant if he saw him plowing and what kind of team he was working, and appellant replied that he was working a red mule and a black mule, and the witness said that this answered the description of the mules he was working. About the first of July, 1952, the appellant was arrested in Columbus, Mississippi. He was later brought to Fulton where he made a full confession in the county attorney's office in the presence of the county attorney and other officers, admitting that he shot and killed the deceased with a .22 pistol. It is abundantly shown that his confession was free and voluntary. He was not advised by the officers of any of the details of the homicide before he made his confession. He has never repudiated his confession, other than to testify on the preliminary inquiry as to the admissibility of the confession that he was scared. A recording was made of his detailed confession, which, after proper qualification, was admitted in evidence. In this confession, he admitted shooting the deceased with a .22 pistol, and gave the following detailed account of his crime: That prior and subsequent to the date of death of the deceased, he was employed with a traveling minstrel show known as "Old Reliable New Orleans Minstrel"; that he was employed as a canvass boy, whose duties required him to assist in erecting the tent and performing other chores about the grounds; that on May 2, 1952, he was temporarily away from the show, and left Amory, Mississippi about 6:30 o'clock in the morning to go to the home of the deceased; that he had known the deceased before and had been to his home and borrowed money from

him; that as he walked along the road and approached Smithville near the home of the deceased, he saw Tom Williams plowing in his field and waved to him; that he reached deceased's home about 10 o'clock in the morning and waited under the corner of the house for deceased to arrive; that while waiting under the house, which was high enough from the ground for him to stand upright, he smoked and threw on the ground burned matches and torn pieces of paper from a Prince Albert tobacco can; that early in the afternoon, he saw the deceased returning to his home; that he stopped at his mail box and then approached his house; that he had a sack of groceries in his hand; that he placed the sack on the edge of his porch and then went to the frame in his yard where he did his cooking; that appellant then shot him with a .22 pistol, striking him under the shoulder blade; that after appellant shot, he heard a dog bark; that deceased sank to the ground with his arm around the center post of the frame; that appellant then went to the deceased and turned him over on his back and unpinned his shirt pocket and removed his wallet containing $90.00; that he threw the safety pin on the ground; that he then went in the house and with a screw driver pried open a desk and removed a .38 pistol; that he threw the .38 pistol in Bull Mountain Creek and tore up and threw away the wallet; that he later sold the .22 pistol to a fruit dealer in Monroe, Louisiana; that he left the scene and returned to Amory, traveling a part of the way in a lumber truck, and then went by train to Columbus, and later rejoined the minstrel show. A search was made by the officers for the .38 pistol and the remnants of the wallet but they were not found.

By way of defense, the appellant introduced as witnesses the undertakers and a reputable surgeon of Amory, Mississippi. The undertakers testified that they embalmed the body of the deceased and performed an autopsy, but were unable to locate the bullet or the point of exit of the bullet. The surgeon testified that

after the autopsy the body was brought to him for X-ray examination, and that an X-ray of deceased's thorax, chest, abdomen, and pelvis failed to reveal the presence of the bullet and that there was no bullet in the body. He further testified that a lead bullet fired into the body will leave lead traces in the body and in the garments through which it passes, and that there were no lead traces in the body or the garments of the deceased. He further testified that he experimented by firing .22 bullets through the garments of the deceased and that lead traces were distinctly discernible. He further said that when the X-ray revealed no bullet in the body, he placed a bullet under the body and X-rayed it, and that the bullet was plainly discernible. The surgeon gave it as his opinion that the deceased was struck with some sharp object and not a gun, and that something else besides a bullet caused the death of the deceased. The surgeon admitted on cross-examination, however, that the fact that the deceased had bled freely from the mouth indicated that the lung had been punctured, and that the passages in the lung are continuous with the passages of the nose and mouth and that "any injury that produces blood in the lung is coughed up."

The appellant also sought by way of defense to prove an alibi. He introduced as witnesses Mr. and Mrs. J. A. Johnson, the owners of the minstrel show, and Jim Thomas, who was employed as a cook with the show. These witnesses testified that on May 2, 1952, the date of the homicide, the minstrel was showing in Florence, Alabama, and that the appellant was with the show on that day and had been with the show every day since his employment on April 18, 1952, until the show went off the road during the early part of June following.

Upon the foregoing testimony for both the state and the defense, the appellant contends that the proof aliunde the confession of the accused is insufficient to establish the corpus delicti and that the evidence as a whole is insufficient to support the conviction.

██ ██ We recognize the well settled rule that a confession of the accused is not alone sufficient to prove the corpus delicti. There are other rules, however, which are equally well settled with respect to the requirements for proof of the corpus delicti. Where there has been a confession by the accused, much slighter evidence is required to establish the corpus delicti than would be necessary where the state must make out its entire case unaided by such confession. Garner v. State, 132 Miss. 815, 96 So. 743; Whittaker v. State, 169 Miss. 517, 142 So. 474; Anderson v. State, 184 Miss. 892, 186 So. 836. ██ ██ The corpus delicti need not be established beyond a reasonable doubt but to a probability, and proof coupled with a confession may be considered as establishing the corpus delicti beyond a reasonable doubt. Nichols v. State, 165 Miss. 114, 145 So. 903; Hayes v. State, 214 Miss. 83, 58 So. 2d 61. ██ ██ Where there has been a confession by the accused, any corroborative evidence will be held sufficient which satisfies the mind that there is a real and not an imaginary crime to which the accused has confessed. Garner v. State, supra. ██ ██ In a homicide case, the corpus delicti consists of the fact of death and the fact of the existence of criminal agency as the cause of death, and both such elements may be proved by circumstances. Watts v. State, 210 Miss. 236, 49 So. 2d 240. ██ ██ Although the corpus delicti cannot be proved alone by the accused's confession, his criminal agency may be shown by his own confession. Roberts v. State, 153 Miss. 622, 121 So. 279.

Considering the state's proof, we have no difficulty in concluding that the proof independently of the confession was amply sufficient to establish the corpus delicti. The deceased was seen returning to his home just after having purchased food supplies. A shot was heard in his direction and the next day his dead body was found in his yard with a fatal wound in his left side. Coupled with the appellant's confession, however,

the proof is ample to satisfy the mind that there was a real and not an imaginary crime to which the appellant confessed. There are too many corroborating factors to admit of the conclusion that the appellant was confessing to an imaginary and not a real crime. The undisputed evidence shows that before the appellant confessed, he was given no information as to the details of the homicide. Had the appellant not been present at the scene of the crime as he said he was, he could not have known that the deceased returned to his home with a sack of groceries in his hand and placed the same on his porch; he could not have known of the presence of Mrs. Bennett's dog, which he said he heard bark after he fired the shot; he could not have known of the position of the body of the deceased as it was found on the ground the next day; he could not have known that the desk in the house had been pried open; he could not have known of the presence of burned matches and the particles of paper torn from a Prince Albert tobacco can under the house where he said he had been standing waiting for the deceased to return to his home; he could not have known of the color of the mules which Tom Williams was plowing in the field on the day of the homicide. These are factors in the evidence which considered in connection with the appellant's confession render inescapable the conclusion that he killed the deceased as he said he did, and that he was confessing to a real and not an imaginary crime. These factors were not figments of the imagination. They were actual facts with which only the appellant's presence at the scene of the crime could have acquainted him.

The surgeon's testimony that in his opinion the deceased's death was caused by a sharp object and not a gun, and the testimony of the witnesses seeking to establish an alibi for the appellant, only served to create an issue of fact for the determination of the jury on the question of appellant's guilt or innocence. In view of

692

the surgeon's testimony that the profuse bleeding from
the mouth of the deceased indicated a puncture of the
lung, and that such an injury produces blood in the lung
which is coughed up, the jury, no doubt, deduced from
the evidence, and were warranted in so doing, that the
deceased coughed up the bullet with the mass of blood
which flowed from his mouth, thus accounting for its
absence in the body upon the X-ray examination. The
jury, no doubt, also deduced from the evidence, and were
warranted in so doing, that the appellant's absence
from the minstrel show for the brief period of a day
might have occurred without the knowledge of those who
were in charge of the show's operations.

Considering the evidence as a whole, we are
clearly of the opinion that the proof without the appel-
lant's confession showed a probability that a crime had
been committed, and that the proof with the confession
was amply sufficient to warrant the jury in finding be-
yond a reasonable doubt that the appellant committed the
crime.

It follows from the foregoing views that the judgment
of the court below should be, and it is, affirmed.

Affirmed.

*McGehee, C. J.,* and *Hall, Lee,* and *Arrington, JJ.,*
concur.