480 So.2d 1104 (1985)
Mike MISKELLEY
v.
STATE of Mississippi.
No. 55032.
Supreme Court of Mississippi.
November 6, 1985.
Rehearing Denied January 15, 1986.
W.O. Luckett, Jr., Luckett Law Firm, Clarksdale, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Billy L. Gore, Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, P.J., and ROBERTSON and PRATHER, JJ.
ROY NOBLE LEE, Presiding Justice, for the Court:
Mike Miskelley was indicted and tried in the Circuit Court of Benton County, Mississippi, *1105 for the murder of Steve Brown. The jury found Miskelley guilty as charged and the lower court sentenced him to serve a term of life in the custody of the Mississippi Department of Corrections. Miskelley assigned twenty-eight (28) errors in the trial below, but briefed and argued only nine (9) of those assignments of error.

The Facts
The principal actors in this case are Mike Miskelley, the appellant, age 15; Steve Brown, the victim, age 15; and Tammy Nance, age 16. Tammy Nance and Steve Brown began dating in 1979, when Tammy was in the ninth grade and Steve was in the eighth grade. About Christmas, 1980, they decided to date other young people, and terminated their steady relationship. After Christmas of 1980, appellant began seeing a lot of Tammy Nance and dated her regularly until about March 19, 1981, prior to the disappearance of Steve Brown on Monday, March 23, 1981. Tammy Nance and Steve Brown started dating again on Saturday, March 21, 1981, and on Sunday, March 22, 1981, Tammy met the appellant at church and informed him that she had a date with Steve Brown the next evening. They were supposed to go to Corinth on Monday, March 23, 1981.
Steve Brown went to school on Monday, March 23, and stayed after school for baseball practice. The last time he was seen alive by his family was around 3:30 that afternoon. The appellant called Steve Brown during the afternoon and asked him, if he wanted to go hunting. Steve agreed to go and appellant picked him up after ball practice on the steps of the high school around 4 or 4:15 p.m. He was sitting with Dwayne Hopkins and was carrying a .22-caliber Mossburg rifle, which his father had given him.
Appellant testified in his own defense. He said that when he got home from school on the afternoon of March 23, he called Steve Brown and inquired if Steve wanted to go hunting with him. Appellant picked Steve up at school in his car around 4 p.m. They went target shooting in the woods near Little Hope cemetery back of the Blackwell church and to a nearby lake and back to appellant's car. Appellant and Steve returned to Falkner, he dropped Steve off in front of the Bank of Falkner, and that was the last time he saw Steve Brown.
Appellant further testified that he picked up his paycheck at Griffin Brothers Grocery store where he worked part-time; that he remembered stashing some beer near the county line and got it, drank one can, and hid the remaining cans of beer in an abandoned pickup truck near his home so that his parents would not find out about his drinking beer; that he went home and the next time he heard anything about Steve Brown was when Steve's father came to his home around 7:30 or 8:00 that night, told him that Steve was missing, and inquired where they had been. Appellant joined in a search for Steve and about 11 p.m., the fire department, county officials and other people conducted a full-scale search. It continued for approximately two (2) weeks, but no sign of Steve was found.
Tim Hopper testified for the defendant/appellant that he had seen Steve Brown at school on the night of March 23, around 7:00, when he attended a Future Farmers of America meeting at the high school. However, his testimony was impeached by one Jerry Barkley, another student, who testified in rebuttal that Tim Hopper had told him he really didn't know, if it was Steve Brown he had seen that night.
After March 23, 1981, appellant and Tammy Nance resumed dating. According to appellant, she continually questioned him regarding Steve's disappearance and claimed to love Steve and wanted him found. Tammy Nance asked appellant over and over where Steve was and appellant always stated that he did not know. Finally, she said, "You killed him, didn't you?" Again, according to appellant, Tammy Nance asked him every day at school and called him at home about the whereabouts of Steve Brown, and said, "If you *1106 don't tell me where Steve is, I ain't gonna' love you no more." Finally, appellant said, "Yes, Tammy, sure, I did it, I killed him." Tammy Nance then would say to appellant that he had buried Steve and appellant said that he admitted it just to shut her up. During this period of time, Tammy Nance was providing sexual favors for appellant.
Pertinent parts of Tammy Nance's testimony taken from the abstract follow:
Steve and I began dating when I was in the 9th grade and he was in the 8th. On March 23, 1981, Steve and I had an agreement in effect by the terms of which we had decided to date other people. However, we had a date for that night. I had not dated anyone else. I had not dated Mike Miskelley. I went places with Mike Miskelley but I didn't call them dates. Mike Miskelley was a "real close friend. I really cared for him. He was very nice to me." On the 23rd of March, 1981, Steve Brown and I had made plans to go to Corinth that night to get him a pair of tennis shoes. He had had a date the Friday night before his disappearance and on that Saturday, we got back together. On Sunday, March 22, 1981, I saw Mike Miskelley at church, Pleasant Hill Baptist Church. I told Mike that I was going to go with Steve the next night. Mike got up and left church. The following morning, March 23, 1981, I went to school, and I recall seeing Steve Brown at school that day... .
... The first night, when Steve Brown disappeared, I questioned Mike Miskelley regarding Steve's disappearance. I asked whether or not he knew where Steve was. Mike responded that he did not, that if he knew where Steve was, he'd go find him. About the 1st of May, Mike Miskelley began to tell me that he had something to tell me, that he would tell me on his death bed. One night on the telephone he mentioned that he had something to tell me, and I told him that if he didn't tell me I would hate him and he said, "Okay, I will tell you." Then he told me that it was about Steve. That's all he said. The next morning in the auditorium at school, he said that he did this for me; that he thought Steve was coming between me and him, and that he done it for a four-letter word called love. He said he'd gotten mad the Sunday before Steve disappeared, he said that he dug a hole, and he said that the next morning he talked Steve into going hunting with him. He said he picked Steve up at school and headed down Highway 370. He said Steve didn't talk much, but that they talked about bulldogs and the band that was at school that day. He said that when they got to the woods, he didn't have his gun, but Steve had his. He said that they set up a bottle and shot at it with Steve's rifle. He said that they "went on up into the woods." He said he saw the hole that he had dug and he knew he had to do what he had come to do. He said he turned his head and pulled the trigger, and then he turned around. He said Steve took a step, and then another one, and then went down to his knees and just looked at him. He said Steve mumbled something, then fell. I started crying. Mike asked me not to cry. Then I settled down; I just wanted to know more. I wanted to know where, and I asked him how it looked, and he said "it didn't look bad." He said he loved Steve but he loved me more. He said it only took one; he said it hit Steve "behind the left ear." I asked him did he have blood in his blond hair? He said he buried Steve Brown, together with Steve's rifle. I asked him how he covered it up to keep it from being seen? Mike said he used "the shovel to cover it up." That's all he told me that day; he never told me where. Later on I asked him where, because I wanted Steve to be found. I loved Steve and I wanted him to be found. Mike said he couldn't tell me where.
Tammy Nance reported to her father appellant's admission, and Sheriff Crum and Highway Patrol Investigator Kenneth Dickson were made aware of it. She made a statement about the admission to them one week later on May 18, 1981. The investigators *1107 requested appellant to take a lie detector test using "the best examiner in the State of Mississippi," a highway patrol examiner in Jackson, Mississippi. Appellant, his father and mother, agreed that appellant should take the test and went to Jackson where appellant underwent the polygraph examination.
Nothing further developed in the investigation until December 27, 1982, (21 months since the disappearance of Steve Brown) when Danny Ross, who was hunting with his father and brother behind Blackwell church in Benton County, Mississippi, found a.22-caliber Mossburg rifle in a hollow tree in the middle of a small drain (branch). He retrieved the rifle and showed it to his father and brother, and the three returned to the location where they found human bones approximately two feet from the drain and a skull which was about six or seven feet away. Authorities were summoned, and the area was searched with the result that a human lower jawbone with braces on it was found. Steve Brown's dentist and orthodontist identified the jawbone as Steve Brown's through his dental records. The .22-caliber Mossburg rifle was identified as that belonging to Steve. The skull found lying on its side had a hole behind the left ear area with another hole in the front forehead area. These remains were approximately thirty (30) paces from a hole that apparently had been dug in the ground.[1]

The Questions

I.

THE STATE FAILED TO PROVE THE CAUSE OF DEATH (CORPUS DELICTI).
Appellant contends that the State failed to prove that a crime had been committed, viz, the corpus delicti; that the State did not prove a criminal agency which caused Steve Brown's death; and that the confession or admission to Tammy Nance was inadmissible to prove the corpus delicti. Medical evidence is not required to establish the corpus delicti, particularly here, the cause of death. McCraw v. State, 260 So.2d 457 (Miss. 1972). In King v. State, 251 Miss. 161, 176, 168 So.2d 637, 643 (1968), the Court said:
The law does not require an autopsy or medical evidence to establish death. These facts are ordinarily proved by witnesses who saw the deceased after his death and who testified that the deceased was dead. The criminal agency or cause of death is usually shown by witnesses who saw the homicide, or by circumstances sufficient to establish the crime to the exclusion of every other reasonable hypothesis.
On the question of criminal agency, the State proved that the skeletal remains of Steve Brown were found at a place and under circumstances that were unusual; that the skull of the deceased, in addition to its natural openings, contained a hole at the front forehead area and a smaller hole in the rear above the left ear.[2] A hole or depression was found in the ground approximately thirty steps north of the skeletal remains, which was three feet deep, three feet wide and six feet long. The evidence indicated that Steve Brown was 5'9" to six feet tall. Even with slight evidence, the confession or admission of an accused is admissible to establish criminal agency. In Jackson v. State, 337 So.2d 1242 (Miss. 1976) the Court said:
It is contended that the corpus delicti was not sufficiently proven prior to the admission of the confession.
The corpus delicti in a homicide case consists of (1) the death of a human being, and (2) a criminal agency causing the death. The testimony showed that the body of the deceased was found at an unusual place under most unusual circumstances, *1108 bruised and swollen with indications of a rape attack. In our opinion, this was sufficient to establish criminal agency. This Court said in Buford v. State, 219 Miss. 683, 69 So.2d 826 (1954), as follows:
Where there has been a confession by the accused, much slighter evidence is required to establish the corpus delicti than would be necessary where the state must make out its entire case unaided by such confession. [Citations omitted]. The corpus delicti need not be established beyond a reasonable doubt but to a probability, and proof coupled with a confession may be considered as establishing the corpus delicti beyond a reasonable doubt. [Citations omitted]. Where there has been a confession by the accused, any corroborative evidence will be held sufficient which satisfies the mind that there is a real and not an imaginary crime to which the accused had confessed... . In a homicide case, the corpus delicti consists of the fact of death and the fact of the cause of death, and both such elements may be proved by circumstances... . Although the corpus delicti cannot be proved alone by the accused's confession, his criminal agency may be shown by his own confession. Roberts v. State, 153 Miss. 622, 121 So. 279. (Id. at 690, 69 So.2d at 830).
337 So.2d at 1248. See also Dycus v. State, 440 So.2d 246, 251 (Miss. 1983).
We are of the opinion that the evidence established the corpus delicti in this case.

II.

EXCULPATORY EVIDENCE OR GRANT OF IMMUNITY WAS IMPROPERLY EXCLUDED IN THE CASE.
Under this assignment, dealing with the polygraph examination taken by Mike Miskelley, the appellant, he contends that appellant, his father and mother, were told, if he would take a polygraph examination and passed it, then he would be clear and would not be implicated further in the death of Steve Brown. Appellant argues that the State failed to keep its part of the bargain, and that the denial of immunity indicates bad faith on the part of the State.
Although appellant claims he was informed that he had passed the polygraph examination, the testimony of Don Bray, who administered the polygraph, reflects that the results were inconclusive.
We have carefully considered the record, and are of the opinion that it does not indicate any agreement or bargain between the accused appellant and the prosecutor. This is not a case for the application of provisional immunity under the facts relating to the polygraph test. Also, it is elemental that the taking of a polygraph test, or the result thereof, is not admissible in evidence. Harrison v. State, 307 So.2d 557 (Miss. 1975); Mattox v. State, 240 Miss. 544, 128 So.2d 368 (1961).

III.

THE LOWER COURT IMPROPERLY LIMITED CROSS-EXAMINATION BY DEFENSE COUNSEL.
In addressing this question, we are mindful of the principle and rule that a witness may not be impeached upon a collateral matter. Likewise, any evidence that is material and relevant, which has a bearing on the motives, bias, and interests of a witness and affects the credibility of that witness is admissible. In our jurisprudence, cross-examination of a witness is a valuable right which may not be infringed upon or bridled. Cross-examination is one of the most potent tools in the trial of lawsuits to ascertain the truth of a matter. Where there is doubt as to the relevancy of the examination, the scales should weigh in favor of admitting the examination. With those guidelines in mind, we look at the State's case.
Steve Brown disappeared March 23, 1981. He was last seen by his family at approximately 3:30 p.m. on that day and was with, and last seen by, appellant around 5:00 to 5:15 p.m. The deceased and *1109 Tammy Nance, the most crucial witness for the State, had been going together for about two years and around Christmas, 1980, they stopped seeing each other and began to date other people. Tammy Nance started going with appellant after Christmas, 1980, until March 19, 1981, four days before Steve Brown disappeared, when Tammy Nance and Steve Brown decided to start dating each other again. After the disappearance of Steve Brown, Tammy Nance and appellant resumed their relationship and began to date each other. According to appellant, on or around May 18, 1981, after persuasion, coaxing and sexual favors, he made statements to Tammy Nance that he had killed Steve Brown; that he had buried the body in a grave dug by himself; and that he had placed Steve Brown's rifle in the grave with him. The State's theory of the case indicates that appellant resented the fact that Tammy Nance broke up with him and was going to start dating Steve Brown again. Appellant contends that the testimony of Tammy Nance as to the confession was a result of coaxing, over-persuasion and threats to deny appellant sexual favors, and that there was no truth in the account by Tammy Nance.
Counsel for the State, in oral argument, admitted that, without the testimony of Tammy Nance setting out the confession/admission of appellant, the State could not make out a prima facie case against appellant. Therefore, the testimony of Tammy Nance is vital to this case and, likewise, the cross-examination of her is crucial to appellant's defense.
We set out from the briefs the following colloquys between the lower court and defense counsel, who was trying to cross-examine Tammy Nance on matters which he deemed important to the defense:
THE COURT: Alright. Objection will be sustained. You'll not refer to it anymore.
DEFENSE COUNSEL: Your Honor, there are a lot of questions I want to ask this witness pertaining to matters that took place after this disappearance. This very confession she says Mike gave her was, I guess, spread over a long period of time culminating into something dated May the 18th, and I ... if the Court, I want to make some ground rules now if you're going to restrict me on my cross examination on things that took place after. I think it's extremely important to the defense in this case, Your Honor.
THE COURT: What is the nature of the things that you want to ask her about?
DEFENSE COUNSEL: Well, going out with Mike Miskelley, sexual intercourse with him, various places they went, secret meetings, notes written, all of which she has denied in statements to us and all of which we've got other independent witnesses to impeach her with. It goes to her credibility, and I feel we can attack it. This is the State's so-called "star witness" who testified that she has a statement of confession from Mike Miskelley. I feel we should be given latitude on cross examination to fully explore her credibility, Your Honor.
DISTRICT ATTORNEY: You're talking about things that are totally irrelevant, immaterial. They're so far removed in time that it could have no probative value. The only thing they can do is prejudice the mind of the Jury.
DEFENSE COUNSEL: Your Honor, I don't believe so. I think they are very probative. The State's trying to paint a case of a fight over a girl, and we're trying to show that she had other interests as well, Your Honor, and there wasn't any fight over this girl.
THE COURT: Well, I don't see where the sexual life of someone may or may not have occurred after this occurrence is related to, has any probative value whatsoever. It's nothing but an attack and an assassination of her character is all it is. I don't see where it's the basis of setting up anything as to credibility. I think a person's life in that area is a very personal thing, and I'm going to rule that it's so prejudicial that it cannot contribute nothing to the case, and I think it's a collateral thing that has no *1110 probative value, and I'm going to sustain the objection, and you'll not refer to it any further.
DEFENSE COUNSEL: Well, Your Honor, then, I do want to make an offer in chambers on this.
THE COURT: Alright, sir.
DEFENSE COUNSEL: Your Honor, it's important because of the fact that here's a girl that's just testified that she loved Steve Brown. She was good friends with Mike Miskelley. She loved Steve Brown so much, we're going to prove, Your Honor, that she had sexual intercourse with him long after Steve Brown disappeared, with Mike Miskelley. [Proffer made].
* * * * * *
DISTRICT ATTORNEY: Your Honor, we object. They have no probative value. There's no way they can have any relevancy in this case. (Referring to Exhibits 34-38).
THE COURT: Alright. Objection ...
DEFENSE COUNSEL: Your Honor, they show her state of mind in the period of time that is pertinent to this matter.
THE COURT: Objection sustained. They're marked for identification. They'll be with the record in that order.
DEFENSE COUNSEL: These notes, in effect, are telling Mike Miskelley that you love him very deeply, don't they?
DISTRICT ATTORNEY: Your Honor, now, we object to that.
THE COURT: Alright. Sustained.
* * * * * *
DEFENSE COUNSEL: May I see the Court in chambers, Your Honor?
(IN CHAMBERS) Your Honor, the purpose of this line of questioning of this witness now that we're here in chambers, is to show the bias and prejudice on the part of this young girl in cooperating with law enforcement officers, who we're going to show, Your Honor, served upon her father a deposition subpoena that was requested to be served, in fact, issued by the Clerk of this Court on the same day the deposition was issued for us for this young girl. He got served. She left town, we think in a hurry, and the proof will also show that she's given an inconsistent statement about who took her out of town. We know it does show that, Your Honor. That's the purpose of this inquiry of her is to show a bias on her part.
* * * * * *
DEFENSE COUNSEL: Were you intimate with her, she with you?
MIKE MISKELLEY: Yes, sir, seemed to be.
DEFENSE COUNSEL: What do you mean by that?
MIKE MISKELLEY: Well, we had sex.
DISTRICT ATTORNEY: Now, Your Honor, we object to that.
THE COURT: Alright, sustained.
* * * * * *
DEFENSE COUNSEL: The Defense is going to show through this witness, if the Court allows it in front of the Jury, that this young girl had sex with this Defendant before this disappearance. After the disappearance, she started continually badgering him, harassing him, causing herself to be a nuisance to him, picking on him, trying to get him to say something or admit things to her when she would suggest answers. Then, it turned, Your Honor, into more of a coercive-type affair where she would tell him she wasn't going to love him and this sort of thing if he didn't talk to her, and she would use this sex bribe, in a sense, against Mike Miskelley repeatedly, and then she'd go out with him, and they'd have sex again, and then she'd start going to work on him again, and she'd get a little bit here and a little bit there, and all this, and that's exactly the scheme of the pattern that developed, Your Honor, and we have witnesses that are lined up that know about this sexual activity and all that totally contradicts what she said, and totally says that what Mike Miskelley says is true in this respect, and that's why I'm troubled. It shows the reason, the bias, the prejudice that this young *1111 girl had and the way that she elicited over a period of time, as she testified to yesterday that she would get a little bit of information from him, but she said, of course, that he was just voluntarily coming to her. That's not the way it was at all according to Mr. Miskelley, and it's extremely important that we are able to show this to the Jury as to how she attempted and tried and coerced to elicit this information from him. That's why this is important. Now, I'm not going to ask this witness about any gory details of any sexual activity. I asked it as gently as I could in view of social mores and all, and that's as far as I intend to get into the nature of any acts she had, but the fact that she was using this type of coercion, this holding back, as she said, loving him was concerned, it is extremely material to this defense, and I think the Jury has a right to know all this. It may attack her credibility. I think it does because she denied it, but it also shows her reasons and her motivations and her coersive [sic] nature in the way that she was dealing with Mike Miskelley in the several months and back about a year following the disappearance and up till the time that this so-called confession was given and then after that, and that's why, Your Honor, it's extremely important to us.
* * * * * *
DEFENSE COUNSEL: Your Honor, may I briefly respond to that?
THE COURT: Alright.
DEFENSE COUNSEL: They put this girl on the witness stand who appears to be the Virgin Mary and who says she loved Steve Brown, and she's just friends with Mike Miskelley. Now, Mr. Coleman argued I didn't ask the proper questions of her with which to impeach her credibility of her testimony. I asked her point blank several times did she have sex with Mike Miskelley before or after. She said, well, I was telling him I loved him, but I was just fooling him and all this kind of testimony, Your Honor. This goes smack to the middle of the whole case of the State, and to prohibit this examination of this witness, at this time, is literally, stops us from presenting about half of the proof in this case, Your Honor. If this young girl had sex with him, then, you know, she did.
DISTRICT ATTORNEY: Your Honor, the credibility of Tammy Glissen Nance, if they want to ask questions about her truthfulness or her veracity, that's what the credibility of a witness is involved, not the specific acts. That's what they're going into.
THE COURT: I'm going to sustain the objection on the basis of this sex thing. Now, any relationship other than that, you can go ahead with it, but you're going to stay out of the sex business. Everything I can find in the law and the evidence in this type case is purely a collateral issue, and if it was a rape case, it'd be a different thing, but ...
Sharon Hurt testified in chambers that, during the trial, she entered the witness room and Tammy Nance motioned for Sharon to come in and sit by her. She told Sharon Hurt what she had testified to while on the witness stand and asked Sharon to go along with what she, Tammy Nance, was telling her. An objection was sustained on the ground that the conversation related to a collateral matter.
In Sanders v. State, 352 So.2d 822 (Miss. 1977), which involved a trial for armed robbery, the defendant's attorney attempted to cross-examine the chief witness for the State, who was an admitted accomplice in the armed robbery, regarding an incident which occurred when Sanders, while a deputy sheriff, attempted to arrest Gowan in possession of marijuana. The State objected to the questions and the lower court sustained the objection. This Court said:
Appellant's attorney argued then, and argues here, that this evidence was material on the question of the alleged motive of Gowan in testifying against appellant. We agree. It is clear that the credibility of a witness may be impeached on cross-examination by showing bias, prejudice, motive or hostility. Tate v. State, 317 *1112 So.2d 23 (Miss. 1975); Palmer v. Clarksdale Hospital, 213 Miss. 601, 57 So.2d 473 (1952). Wide latitude is to be allowed on cross-examination to show bias or motive for the purpose of affecting credibility. Cody v. State, 167 Miss. 150, 148 So. 627 (1933). Although the extent of this cross-examination lies within the sound discretion of the trial court, its ruling will be reversed when an abuse of that discretion is shown. McElroy, Mississippi Evidence, § 183, pp. 514-515 (1955).
352 So.2d at 824.
In Myers v. State, 296 So.2d 695 (Miss. 1974), the Court stated:
The record reveals that the witness, Sidney Jeffers, testified on behalf of the state and gave a detailed account of what transpired on the day of the slaying and stated that appellant shot the officer, Larry Cox. While implicating the appellant, the witness attempted to exonerate himself from any participation in the officer's death. However, when he was being cross-examined by defense counsel, certain discrepancies appeared in his testimony, and upon being pressed for answer, the witness' attorney, who was sitting in the courtroom advised the witness of his rights under the Fifth Amendment to the Uunited [sic] States Constitution. As a result, the witness refused to testify further on the grounds that it might incriminate him.
The appellant then made a motion that the jury be instructed to disregard in its entirety Jeffers' testimony; however, the motion was overruled. One of the questions which Jeffers refused to answer was whether or not he had in fact shot the deceased.
... As to the right of cross-examination, this Court said in Crapps v. State, 221 So.2d 722 (Miss. 1969):
* * * * * *
The general rule on this subject is that where one is deprived of an opportunity to cross-examine a witness without fault on his part, ... he may have such testimony previously given on direct examination excluded from the consideration of the jury. (Id. at 724.)
The right of confrontation and cross examination is not satisfied by a witness submitting himself to token interrogation but extends to and includes the right to fully cross-examine the witness on every material point relating to the issue to be determined that would have a bearing on the credibility of the witness and the weight and worth of his testimony.
296 So.2d at 700.
We are of the opinion that, considering the theories of the State and the defense which relate to the reason and motive for Steve Brown's death, the following matters were relevant as bearing upon the interest, bias, motive, hostility and credibility of Tammy Nance:
(1) The conduct of Tammy Nance and her relationship with Steve Brown and appellant for the period after Christmas, 1980, until March 23, 1981.
(2) The conduct of Tammy Nance and her relationship with appellant, together with letters and notes, from March 23, 1981, until May 18, 1981, the date the alleged confession made by appellant to Tammy Nance was given to the investigating officers.
(3) The resumption of dates and the relationship between appellant and Tammy Nance from May 18, 1981, insofar as being relevant to the interest and credibility of Tammy Nance.
(4) The effort, if any, of Tammy Nance to get Sharon Hurt to change her testimony in order that it would correspond to the testimony of Tammy Nance insofar as such testimony related to the interest, bias, motive and credibility of Tammy Nance in the case. Sharon Hurt should be permitted to testify toward the impeachment of Tammy Nance on a material matter involving her credibility.
We are of the opinion that the lower court unduly restricted cross-examination and impeachment on the above matters; that they were crucial to the issue on the confession or statement allegedly made by *1113 appellant to Tammy Nance; and they require that this cause be reversed and remanded for a new trial.

IV.  VII.
The appellant contends (1) the lower court improperly limited voir dire of the jury; (2) the trial judge assumed a prosecutorial role; (3)(a) the lower court refused to permit appellant to put on surrebuttal witnesses, (b) the lower court refused to allow Sharon Hurt to impeach Tammy Nance by an attempt to change her testimony, and (c) instructions of the court. These assigned errors either will not occur on a retrial, or we have addressed same, and it will not be necessary to discuss them further.
Because of the error discussed under Assignment III, the judgment of the lower court is reversed and the case is remanded for a new trial.
REVERSED AND REMANDED.
PATTERSON, C.J., WALKER, P.J., and DAN M. LEE, PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS, J., not participating.
NOTES
[1] According to Tammy Nance, before the remains were found, appellant told her that he shot Steve Brown behind the left ear with Steve's own rifle; and that he had dug a grave and buried him along with the rifle.
[2] The inference follows that a bullet entered at the rear, leaving a small hole, and emerged at the front, causing a larger hole.