490 So.2d 839 (1986)
Curtis NORRIS
v.
STATE of Mississippi.
No. 56096.
Supreme Court of Mississippi.
May 28, 1986.
Rehearing Denied July 16, 1986.
*840 Laurel G. Weir, Thomas L. Booker, Philadelphia, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by DeWitt Allred, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before WALKER, P.J., and PRATHER and SULLIVAN, JJ.
SULLIVAN, Justice, for the Court:
Curtis Norris was convicted of aggravated assault for knowingly causing bodily injury to Terry Winstead by stabbing him with a knife. Norris was sentenced to fifteen (15) years in the Department of Corrections by the Circuit Court of Neshoba County, Mississippi.
Norris, a veteran of the Vietnam war, suffers from post-traumatic stress syndrome. On the night of May 5, 1984, while Norris, a patient at the Veterans Hospital, was out on a pass from that institution, he became an uninvited guest at the Neshoba County fairground cabin of Terry Winstead, where a party was in progress. Norris had consumed four or five quarts of beer and was taking medication, including valium. Around 11:00 p.m., Norris got into a scuffle with Doug Hardin, an invited guest. Ever the good host, Winstead intervened and attempted to escort Norris from the cabin. Norris struck Winstead, and Winstead, having gone as far as he could in deference to the customs of Southern hospitality, struck Norris back. Carl Ellis eventually got Norris outside and Norris left the cabin area. Approximately one hour later, Norris returned to the party and when the unarmed Winstead told him to leave Norris pulled a knife and stabbed Winstead in the stomach. The resulting wound, a cut from 1 1/2 to 2 inches long, bled *841 profusely. Winstead was taken to get medical attention and Norris was disarmed and arrested.
After the incident of May 6, 1983, Norris was returned to the Veterans Hospital and there remained until July 2, 1984.
Norris was indicted on September 20, 1984, and on the 21st he filed notice that he intended to rely upon the defense of insanity at the time of the crime. He moved for psychiatric examination, which was conducted by Dr. Timothy Summers. Dr. Summers concluded, as a result of the examination, that Norris knew the difference between right and wrong at the time of the crime and that he was competent to stand trial and participate with his attorney in his own defense.
The two-day trial began on September 26, 1984. Norris's motion for a directed verdict at the conclusion of the state's case was overruled. Norris then testified, and Dr. Stanley Russell also testified in his behalf as to the insanity defense. The state presented Dr. Summers in rebuttal on the insanity issue.
Found guilty by the jury, and sentenced to fifteen (15) years, Norris moved for a new trial. When he failed to get a new trial, he appealed to this Court.

I.

WAS IT ERROR TO GRANT INSTRUCTION S-4 OVER THE OBJECTION OF 
NORRIS?
Instruction S-4 offered by the state is the "McDaniel Rule" that voluntary intoxication is not a defense to a crime. Norris objected that insanity, not intoxication, was his defense and, therefore, the state had no entitlement to instruction S-4. Norris argued to the trial judge that McDaniel v. State, 356 So.2d 1151 (Miss. 1978) was inapplicable as the case was governed by Lee v. State, 403 So.2d 132 (Miss. 1981), which held that the state was not entitled to a "McDaniel Rule" instruction to avoid the burden of proving intent.
The trial judge ruled that both sides had gone into the question of the condition of Norris with regard to alcohol and drugs, and thus the intoxication issue was before the jury. Furthermore, the trial judge found that while both doctors agreed that Norris suffered from post-traumatic stress disorder, they disagreed as to his mental condition at the time of the stabbing. Therefore, the trial judge reasoned that there was a factual issue under M'Naughten for the jury to decide, and a M'Naughten instruction (S-2) had been given.
Concluding that the jury could find that Norris was not M'Naughten insane at the time of the trial, the judge found that the evidence required him to instruct the jury that voluntary intoxication was not a lawful defense. Reluctantly, the trial judge granted instruction S-4. Norris again alleges that the record clearly shows that his defense was that of not mentally knowing right from wrong and at no place was the issue as to intoxication made a defense; his testimony concerning alcohol and drug abuse was only in reference to symptoms of post-traumatic stress disorder. Norris further contends that instruction S-4 caused the jury to find him guilty and to disregard his insanity plea defense.
In McDaniel v. State, supra, we said:
If a defendant, when sober, is capable of distinguishing between right and wrong, and the defendant voluntarily deprives himself of the ability to distinguish between right and wrong by reason of becoming intoxicated and commits an offense while in that condition, he is criminally responsible for such acts.
356 So.2d at 1161 (Sugg, J., concurring, with a majority of the Court agreeing with the rule).
We followed this rule in Harris v. State, 386 So.2d 393 (Miss. 1980). In Lee v. State, 403 So.2d 132 (Miss. 1981), the issue concerned the amendment, by the trial judge, of the defendant's instruction by adding the McDaniel rule. There we said the following:
The McDaniel rule prevents "submission to a jury the question of voluntary intoxication as a defense in specific intent *842 offenses." 356 So.2d at 1161. An amplified restatement of the rule is: a defendant, capable of distinguishing between right and wrong when sober, is not entitled to an instruction submitting to the jury his inability to form the specific intent to commit an offense because of his voluntary intoxication at the time the offense was committed. The rule was followed in Harris, supra.

In this case defendant was not entitled to the instruction in question, either as submitted by him, or as modified by the trial judge.
Id. at 134.
The Court additionally said the following:
We hasten to add that voluntary intoxication is not a substitute for intent. Trial courts must remember that the purpose of the McDaniel rule is to remove voluntary intoxication as a defense, not to provide an affirmative instruction for the state which might mislead a jury into thinking that it is not necessary to prove intent, when intent is a requisite ingredient of the offense.
Id.
It is this last statement that Norris contends is authority for reversal. However, in Smith v. State, 445 So.2d 227 (Miss. 1984), one of the assignments was that the court erred in granting a McDaniel rule instruction to the state. We noted the McDaniel and Lee cases, and then said the following:
The McDaniel court did not limit the question of voluntary intoxication to instructions either for the State or the accused. The rule is simply and clearly stated therein and means that, if a person, when sober, is capable of distinguishing right and wrong and voluntarily intoxicates or drugs himself to the extent that he does not know or understand his actions, e.g., steals, robs, or murders, he is responsible and he may be convicted and sentenced for the crime.
445 So.2d at 231. Further, in Jackson v. State, 381 So.2d 1040 (Miss. 1980), we did not find that it was error for the court to give a McDaniel rule instruction.
As Justice Hawkins has said, "the horns were extended to their original McDaniel length" in Smith, after he had attempted to "pull in the horns in Lee." Cummings v. State, 465 So.2d 993, 998 (Miss. 1985), (Hawkins, J., dissenting).
Cummings is further authority for the conclusion that the state can be granted a McDaniel rule instruction. The complaint of Cummings that his instructions concerning intoxications as a defense should have been granted was held meritless on the authority of McDaniel; however, Cummings also contended that the two refused instructions, in conjunction with the McDaniel rule instruction granted for the state necessitated a reversal. The Court said, "Instruction S-3 ... does no more than set forth for the jury's guidance the rule pronounced in McDaniel thereby leaving this contention without merit." 465 So.2d at 996.
Norris argues that his case is distinguishable from McDaniel and its progeny because he did not make intoxication a defense. True he did not request an intoxication defense instruction; however, it is clear that intoxication was made an issue by Norris regardless of whether it was expressly made a defense.
It is apparent that a jury could reasonably infer from the testimony of Norris that, because he was so drunk, he did not know what he was doing. From that, a reasonable juror could infer that Norris did not have the requisite intent to commit the crime; this is exactly what the McDaniel rule prohibits. Where, as in this case, the evidence justifies it, the state may be granted a McDaniel instruction.
As to the second claim of Norris that instruction S-4 caused the jury to find him guilty and to disregard his defense of insanity, one needs only to read all the instructions together to find that it was clear that the jury was instructed as to the state's burden in proving all the elements of the crime and in proving that Norris was sane. See Johnson v. State, 475 So.2d *843 1136 (Miss. 1985); Norman v. State, 385 So.2d 1298 (Miss. 1980).
There is no merit to this assignment.

II.

DID THE LOWER COURT ERR IN NOT GRANTING A NEW TRIAL ON THE GROUND THAT THE VERDICT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE?
The essential contention of Norris under this assignment is that it was undisputed by both psychiatrists that Norris suffered from post-traumatic stress disorder, and that since his psychiatrist was in a better situation to evaluate whether Norris was M'Naughten sane at the time of the incident, and it was his opinion that Norris was insane, the jury verdict was against the overwhelming weight of the evidence.
While couched in the overwhelming weight language, this assignment is little more than the pitting of one expert against the other, and seeking to have the court instruct the jury which expert they must believe.
Dr. Stanley Russell was the psychiatrist who testified for Norris. He had been treating Norris at the Veterans Administration Hospital in Jackson intermittently since January of 1982. He had diagnosed Norris as suffering from post traumatic stress disorder. In summary, Dr. Russell's testimony was that this is a psychiatric condition common among Vietnam veterans in which the individual has been subject to a traumatic experience which was so overwhelming that he is not able to deal with it effectively. The effect is that the condition may remain latent, with subconscious effects only, until something triggers it, causing the individual to have what is referred to as a "flashback" wherein he thinks he is back in the same traumatic situation and he reacts accordingly.
When Norris was returned to the hospital on May 6, immediately after the incident, he discussed it with Dr. Russell. It was Dr. Russell's opinion that Norris had perceived himself in a hostile environment at the cabin and it had triggered a flashback. According to Russell, in Norris's mind he was back in Vietnam and simply defending himself from being killed as he would have in Vietnam and not in Philadelphia, Mississippi.
Dr. Russell admitted that his conclusions were based on what Norris had told him, and that it was possible that Norris was just drunk and mad, though he did not consider it likely. Dr. Russell also stated that even though Norris was intoxicated that would not change his opinion that Norris had had a flashback on May 6 when the stabbing occurred. In response to questioning as to whether Norris knew right from wrong, Dr. Russell stated in essence that Norris was responding to a different situation from that which the others present were perceiving. Norris was responding to a similar situation to what he would have confronted in combat; there, right and wrong carried a different connotation.
Dr. Timothy Summers, who had examined Norris on September 24, 1984, pursuant to court order, testified for the state. He admitted that Norris did suffer from post traumatic stress disorder. He disagreed with Dr. Russell, however, and stated that it was his opinion that at the time the incident occurred Norris knew right from wrong. It was further the opinion of Dr. Summers that drinking, combined with the amount of valium that Norris was taking, could have caused his behavior to the exclusion of any flashback experience.
The jury also was treated to actual occurrence witnesses Winstead, Debbie Ellis and Carl Ellis, all of whom indicated that Norris appeared just to be angry about being thrown out of the cabin and was responding to being thrown out again.
As we have stated many times in challenges that a jury verdict on an insanity issue was against the overwhelming weight of the evidence, the issue is a jury issue and in making the determination the jury may take into consideration all of the testimony *844 surrounding the homicide including such expert testimony as may be offered. Laney v. State, 486 So.2d 1242 (Miss., 1986) (not yet reported); Billiot v. State, 454 So.2d 445 (Miss. 1984); Edwards v. State, 441 So.2d 84 (Miss. 1983); Groseclose v. State, 440 So.2d 297 (Miss. 1983); Lias v. State, 362 So.2d 198 (Miss. 1978); Herron v. State, 287 So.2d 759 (Miss. 1974); and Smith v. State, 245 So.2d 583 (Miss. 1971).
No doubt to some the testimony of Dr. Russell, who saw Norris the day before the incident and the morning after the incident, will be more persuasive than the testimony of Dr. Summers. However, this was not the case to the jury at the trial. We cannot say, when we consider all of the facts and circumstances surrounding the incident which was presented to the jury as well as the expert testimony of the two doctors, that the decision of the jury was against the overwhelming weight of the evidence.
It may well be that post-traumatic stress disorder is a special case as is schizophrenia, paranoia type, which should be treated in a manner different from that which is set out above. At least two justices on this Court have spoken eloquently but to date unconvincingly that the M'Naghten test and our present rules on the insanity defense are no longer feasible.
Be that as it may, M'Naghten is still the test in Mississippi, and the jury must still make the determination from the evidence presented before it. We will not disturb the finding of that jury unless it is contrary to the substantial weight of the evidence. There is no merit to this assignment of error.

III.

DID THE LOWER COURT ERR IN NOT PERMITTING PROPER 
CROSS-EXAMINATION OF WITNESSES?
Our rule in this regard is that, while cross-examination should be liberally allowed, the scope of the cross-examination rests within the sound discretion of the trial court and is subject to reversal only upon a clear abuse of that discretion. Ward v. State, 479 So.2d 713, 716 (Miss. 1985).
The first incident complained of concerned the testimony of Dr. Summers during rebuttal. During the recross examination of Dr. Summers, he was asked:
Q You still say that he really thought, and it's your opinion, that he really thought that he was doing some act in defending himself, whether, as a layman might see it right or wrong, he himself thought he was, in effect, defending himself?
BY MR. PEARCE: Your Honor, I'll object to this, as it is beyond the scope of this witness.
BY THE COURT: Sustained.
BY MR. WEIR: No further questions.
BY THE COURT: Are you finally discharging this witness?
BY MR. PEARCE: Yes, Your Honor, we are.
We initially point out that this was recross examination of a witness after he had been asked two questions on redirect. When the objection was sustained, counsel for Norris did not ask any more questions, nor did he attempt to rephrase the question. We are of the opinion that the trial court did not abuse its discretion in not allowing this question. Norris was not denied an opportunity to test the credibility of the witness. Compare Miskelly v. State, 480 So.2d 1104 (Miss. 1985).
The next incident took place after appellant's counsel had questioned Dr. Russell during surrebuttal. The prosecution cross-examined Dr. Russell and asked him one question, a follow-up to the last question asked by the appellant as follows:
Q Would it be safe for him to be released into society at the present time?
A. In my opinion, yes.
BY MR. BOOKER: No further questions.
BY THE COURT: Cross-examine?

CROSS-EXAMINATION
BY MR. PEARCE:
*845 Q Just as safe now as he was on May the 4th when you gave him the pass?
A Absolutely.
BY MR. PEARCE: No further questions.
BY THE COURT: Alright. You're finally excused, Dr. Russell. (Witness excused.)
BY MR. WEIR: There was one other question, Your Honor.
BY THE COURT: You had him on direct and recross and now. We're going to quit. I don't know of any more questions that can be asked than what has been asked. Mrs. Amis, come here with your notes. Mr. Booker, Mr. Weir, and State's Counsel.
No record was made of what the question would have been. This was in essence redirect for the appellant; he already had taken the witness on direct in the appellant's case in chief, then on direct in surrebuttal, and he now wanted to take the witness again in redirect in surrebuttal in response to one follow-up question asked by the prosecution on cross-examination. This was not cross-examination. Norris had ample opportunity to bring out the testimony favorable to him. There was no abuse of discretion in not allowing this question and, therefore, no merit to this assignment of error.

IV.

DID THE LOWER COURT ERR IN NOT GRANTING A MISTRIAL BECAUSE A 
JUROR WAS ASLEEP?
During the examination of Dr. Russell, the judge noticed that a juror was nodding and the following took place:
BY THE COURT (TO THE JURORS): Just a minute. Mr. Thompson. Mr. Viverette, will you shake the fellow there. You'll have to stay awake, now. All of you stand up for just a moment and stretch.
(JURORS STAND IN THE JURY BOX)
Alright, you may sit back down. Alright, Mr. Booker.
Appellant's counsel continued questioning Dr. Russell and did not attempt to object to the incident until after the defendant was found guilty and just prior to sentencing when he made a motion for a mistrial, or a new trial, because the juror was asleep. The trial court said the following into the record:
BY THE COURT: The defendant, Curtis Norris, has filed his Motion for New Trial, and among others, has assigned the Defendant should be granted a new trial because a juror was asleep during the taking of the testimony of the Defendant's case. The Court observed Juror Fommie Thompson with his eyes closed during the time the case was in trial, and not knowing whether the juror was asleep or awake, I asked one of the jurors to awaken him, and then had all jurors to stand up and stretch. I constantly observed the jury, and if this juror was, in fact, asleep, he could have only been asleep for a few brief moments. Therefore, I fail to see how he could have possibly missed very much of the testimony.
Norris does not cite any cases as authority for reversal; instead, he attempts to distinguish Hines v. State, 417 So.2d 924 (Miss. 1982), wherein the following was said:
The appellant next argues that the court erred in failing to declare a mistrial, or in the alternative, to replace a juror, who was allegedly asleep, with an alternate juror to conclude the case.
It was claimed that the juror had been asleep during the closing argument of the appellant.
The trial judge made a finding that if the juror was indeed asleep, he awoke before the matter was brought to the attention of the court by appellant's counsel. This finding was made during the appellant's motion for a J.N.O.V. or in the alternative for a new trial, at which time the trial judge stated, in overruling the appellant's motion:
....

*846 On the second ground, the Court has a few comments to make concerning its own observation of what did take place. The Court was not looking at the jury when Mr. Gilfoy pointed out to the Court that we had a juror who was asleep. I looked at the jury and juror Dixon did have his head down and his hands over his eyes. The juror next to him hit him in the side or punched him in the side and he looked at the juror and said to him, "I am not asleep," and he looked at the Court and said "I am not asleep." The argument proceeded. The defense argued. Mr. Gilfoy was going through his argument at which time Mr. Gilfoy again pointed out that juror Dixon appeared to be asleep, at which time I looked again at Dixon and I watched him thereafter throughout the argument. He did have his head down and he had his hands over his eyes but when the comment was made by Mr. Gilfoy he raised his head and looked at me and said "I am not asleep." Therefore, the Court is of the opinion that if juror Dixon was asleep he awoke. He was awakened by his fellow who punched him in the side when Mr. Gilfoy brought it to my attention and thereafter the Court is convinced from his responses to me, which were made directly to me after Mr. Gilfoy pointed out that he was asleep, that he was not in fact asleep because he moved his hands and raised his eyes and indicated that he was not asleep.
In this case, the trial judge found that the juror was not asleep and thus there was no need to remove him from hearing the rest of the case.
We hold that due to the trial judge's finding that the juror was indeed awake, the appellant's assignment of error is without merit.
Id. at 925.
Norris claims that his case is distinguishable because the judge in Hines found that the juror was not asleep, while no such affirmative finding was made by the trial judge here. We are satisfied that the judge's finding set out in the record in this case was a sufficient and justifiable reason for allowing the juror to remain on the jury.
Moreover, in Gerlach v. State, 466 So.2d 75 (Miss. 1985), Gerlach complained on appeal of jury tampering. However, counsel had said nothing about it until several days later, after the jury's guilty verdict. The Court mentioned Hines by anology, and then said the following:
It would appear that, if Gerlach had objected at trial to Carvin's remaining upon the jury on the grounds that the information in the telephone call would adversely prejudice Carvin's deliberations concerning Gerlach's guilt, then Carvin should have been taken off the jury and an alternate juror seated. In this context we note that the trial judge interrogated Juror Carvin extensively, and it appears without serious doubt that the juror understood her obligation to disregard the telephone call and to decide the case solely on the evidence presented in open court. Because the record fails to reflect a timely and adequate objection on the part of defense counsel, we deny the assignment of error.
Id. at 79.
No reversible error occurred because the trial judge gave a sufficient justification for leaving the juror on the jury, and there was no timely complaint by counsel to the juror continuing to serve.

V.

DID THE LOWER COURT ERR IN NOT GRANTING A MISTRIAL BECAUSE OF THE INTRODUCTION OF EVIDENCE CONCERNING BLOOD AND INFLAMMABLE MATTERS IN EVIDENCE BEFORE THE JURY?
Norris contends here that the continual reference to how badly the victim was bleeding and other inflammatory matters, and allowing Winstead to exhibit his scar to the jury, necessitated a mistrial.
*847 During Winstead's testimony, he described what happened after the knife was pulled out: "blood was gushing out and cut was just gaping open with blood pouring out." Winstead testified that the bleeding did not stop on the way to the hospital and "it was running out  gushing out, went all over the jeep, all over me, and I was just covered with blood." No objections were made by the appellant to this testimony.
Objection was made when Winstead testified that when the doctor came in he put two fingers in the wound. However, this objection went to what the doctor said afterwards on the grounds of hearsay and that objection was sustained.
Later, when the prosecution requested Winstead to show these scars to the jury, the appellant finally objected. In chambers, the judge observed the wound and, after first sustaining the objection, the following occurred:
I am going to reverse my ruling as to the prosecuting witness exhibiting his scar. The State has the burden of proof of proving the criminal activity of the Defendant as well as the result of that criminal activity. The wound is evidence of the assault as being aggravated. I am only going to permit you to let him identify the wound that was made without reference to the surgical scar.
BY MR. WEIR: Your Honor, may we object to that because there is no way the jury can separate the two without the doctor being here and that the place of the tube and the scar left by the operation is still what we call a gruesome matter for the jury to observe with no explanation for it. We were told yesterday that the treating physician, Dr. Matthews, would be here to testify for the State.
BY THE COURT: Well, the surgery is the treatment of this witness, and, as far as that is concerned, if he received no treatment, no surgery, and the slight wound had been made, the crime would have been completed, but the scar goes to aggravating circumstances, and the objection is over-ruled. By the exhibition of the wound, you would have the right to call the doctor as a witness.
BY MR. BOOKER: May we have a continuing objection to it so we won't have to object in front of the jury, Your Honor?
BY THE COURT: Yes, you may have a continuing objection, and it's over-ruled.
BY MR. WEIR: And a motion for mistrial?
BY THE COURT: Yes, sir, and anything else you want, and it's overruled, too.
WHEREUPON, AT THE CONCLUSION OF THESE PROCEEDINGS, THE JUDGE, COURT REPORTER, AND ALL ATTORNEYS RETURNED TO THE COURTROOM, WHERE THE FOLLOWING PROCEEDINGS WERE HAD IN THE PRESENCE OF THE JURY:
BY THE COURT: Alright, we're back in the presence of the jury.
BY MR. KILPATRICK:
Q Mr. Winstead, I would ask that you stand and raise your shirt and exhibit to the jury the scar and the cut  step around over here, please, and answer my question.
(WITNESS LEAVES THE WITNESS STAND TO APPROACH THE JURY)
BY THE COURT: Rephrase your question, Mr. Kilpatrick. Let him exhibit the wound that he received as contended and alleged to have been caused by the Defendant, Curtis Norris.
BY MR. KILPATRICK:
Q Terry, raise your shirt. Could you point out to the jury the wound you received when you were stabbed by Curtis Norris that was examined by the treating physician at the hospital by sticking his two fingers in you?
BY MR. WEIR: We object to that, Your Honor.
BY THE COURT: Over-ruled.
BY THE WITNESS: Right here.
During Debbie Ellis's testimony concerning the stabbing, she also testified about the extensive bleeding. No objection was made.
*848 Carl Ellis, another occurrence witness, also testified about how bad Winstead was bleeding, without objection by the defense.
At the conclusion of the state's evidence, after the motion for directed verdict was overruled, Norris made a motion for a mistrial because of all the testimony concerning the blood. The motion was overruled and the trial judge stated that it was too late since the motion was made after the evidence was admitted. The defendant renewed the motion prior to submitting the case to the jury. Again it was overruled and the judge stated the following:
The State has the responsibility of proving the assault and the assault was aggravated. The Defendant did not timely object when that evidence was being admitted, and did not allow the Court the opportunity to rule. Your motion is over-ruled.
In Sumner v. State, 316 So.2d 926 (Miss. 1975), we said the following:
The rule governing the time of objection to evidence is that it must be made as soon as it appears that the evidence is objectionable, or as soon as it could reasonably have been known to the objecting party, unless some special reason makes a postponement desirable for him which is not unfair to the proponent of the evidence.
Id. at 927.
Even considering the objection to the testimony concerning the blood along with the properly made objections to the showing of the scar and references to the wound as being the one examined by the physician "by sticking his two fingers in you", the first inquiry is whether any of the evidence was relevant. Johnson v. State, 475 So.2d 1136, 1144 (Miss. 1985).
Mississippi Code Annotated § 97-3-7(2)(b) (Supp. 1985), provides as follows:
(2) A person is guilty of aggravated assault if he... (b) attempts to cause or purposely or knowingly causes bodily injury to another with a deadly weapon or other means likely to produce death or serious bodily harm; ...
In Sadler v. State, 407 So.2d 95 (Miss. 1981), an aggravated assault case, the Court said the following:
Finally, complaint is made that certain photographs admitted into evidence showing the extent of the injuries inflicted upon Deputy Covington was error and required reversal. These photographs depicted the bodily injury which resulted when Sadler shot Deputy Covington in the face with his shotgun.
In Voyles v. State, 362 So.2d 1236 (Miss. 1978), this Court said:
This Court has held that in considering the competency, relevancy and materiality of photographs, it is within the sound discretion of the trial judge to determine whether or not the photographs have a legitimate evidentiary purpose.
.....
The severity of these injuries, which were the natural consequence of the discharge of the shotgun into Deputy Covington's face, removes any question that Sadler's intention was to kill or grievously wound Deputy Covington. The trial court did not abuse its discretion in admitting these photographs into evidence. (citations omitted)
Id. at 98. See also Colburn v. State, 431 So.2d 1111 (Miss. 1983); Gray v. State, 389 So.2d 1384 (Miss. 1980); Brooks v. State, 360 So.2d 704 (Miss. 1978); Blaine v. State, 196 Miss. 603, 17 So.2d 549 (1944).
We are of the opinion that the bleeding, the scar, and the wound, and the fact that it was big enough for two fingers to be inserted into it, were all relevant as tending to show that Norris "purposely ... cause[d] bodily injury ... with a deadly weapon ... likely to produce death or serious bodily harm".
The second step must be to determine whether, in the context in which this evidence was presented, it was inflammatory. In Overstreet v. State, 369 So.2d 275 (Miss. 1979), we said the following:

*849 The appellant further ascribes as error the introduction of bloody items of the decedent's clothing as irrelevant and inflammatory. We have recently held a presumption of reversible error is created by the introduction of evidence inflammatory in nature, but that the presumption can be negated when it can be said with confidence that no harmful effect resulted. Tudor v. State, 299 So.2d 682 (Miss. 1974). However, the balancing of inflammatory characteristics versus probative value is logically dependent upon the relevancy of the evidence.

Id. at 277 (emphasis added).
We are of the view that the prejudicial effect, if any, upon the jury did not outweigh the relevancy as to whether Norris used force likely to produce death and that, therefore, there was no reversible error.
CONVICTION AND SENTENCE OF FIFTEEN (15) YEARS AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and ANDERSON, JJ., concur.